STATE OF NORTH CAROLINA v. JIMMY WAYLON WARD

No. COA08-978

(Filed 18 August 2009)

**1. Evidence— prior crimes or bad acts—drug seizures—prior incident ending in dismissal—admissibility**

Evidence of drug seizures in an earlier incident in which the charges were subsequently dismissed for insufficient evidence was permissible in this case under N.C.G.S. § 8C-1, Rule 404(b) for the purpose of showing intent, knowledge, identity, and the existence of a common plan or scheme to sell drugs. The time between events was relatively short (February of 2005 to August of 2006) and the similarities substantial.

**2. Evidence— prior crimes or bad acts—drug possession— prior incident ending in dismissal—no probative value**

Under an N.C.G.S. § 8C-1, Rule 403 analysis, the probative value of an earlier incident in which defendant had in his possession prescription medicine depended upon a finding that defendant then possessed unlawful controlled substances. Since defendant was acquitted of the earlier offenses, the admission of evidence of the earlier incident was error.

**3. Evidence— prior crimes or bad acts—drug possession— prior incident—prejudicial as to similar drugs—not prejudicial for unrelated substances and charges**

The erroneous admission of evidence that defendant possessed prescription medication on an earlier occasion would not

1

have affected convictions in a current prosecution involving unrelated substances and paraphernalia not usually associated with prescription drugs. However, there is a reasonable possibility that the erroneous admission of the earlier seizure of prescription medications from defendant affected his chances for a more favorable outcome on current charges involving prescription drugs, as well as maintaining a dwelling and a vehicle for the purpose of keeping and selling drugs.

### 4. Evidence— expert testimony—controlled substances— visual identification

The trial court erred in an unlawful drug prosecution by allowing an expert witness to identify controlled substances based on a visual examination rather than a chemical analysis. The visual procedure used here does not provide adequate indices of reliability sufficient to support the admission of expert testimony.

Appeal by Defendant from judgment entered 14 January 2008 by Judge Charles H. Henry in New Hanover County Superior Court. Heard in the Court of Appeals 23 February 2009.

*Attorney General Roy Cooper, by Assistant Attorney General John P. Barkley, for the State.*

*Paul F. Herzog, for Defendant.*

ERVIN, Judge.

Jimmy Waylon Ward (Defendant) appeals a judgment entered 14 January 2008 based upon his convictions for six counts of trafficking in opium based on indictments returned in File Nos. 06 CrS 60670 and 06 CrS 60685,[1] and single counts of intentionally maintaining a dwelling for keeping or selling controlled substances,[2] possession of cocaine, and intentionally maintaining a vehicle for the keeping or selling controlled substances, which reflected charges set out in the first, second, and third counts of the indictment returned in File No. 06 CrS 60686.[3] The trial court's judgment also reflected a jury verdict

---

1. In the present cases, Defendant was charged with trafficking in opium by sale, transportation, and possession on 22 August 2006 in File No. 06 CrS 60670 and by manufacturing, possession, and transportation on 23 August 2006 in File No. 06 CrS 60685.

2. The controlled substances that Defendant allegedly kept at or sold from his dwelling were "Lorcet, Valium, Ritalin, Lortab, Percocet, Xanax, Oxycodone, Cocaine and Adderall."

3. The controlled substances that Defendant allegedly kept at or sold from the vehicle in question included "Lorcet and Lortab."

convicting Defendant of possession of Ritalin with the intent to sell or deliver, possession of Xanax with the intent to sell or deliver, and possession of Valium with the intent to sell or deliver, which were charged in the first, second, and third counts of the indictment returned in File No. 06 CrS 60687, and possession of drug paraphernalia, which was charged in the fourth count of the indictment returned against Defendant in File No. 06 CrS 60689. The jury also convicted Defendant of possessing Oxycodone with the intent to sell or deliver, which was charged in the third count of the indictment returned in File No. 06 CrS 60688.[4] After accepting the jury's verdict, the trial court arrested judgment in connection with Defendant's conviction for possessing Oxycodone with the intent to sell or deliver. The trial court consolidated all of the remaining charges for judgment[5] and imposed an active term of ninety to one hundred and seventeen months imprisonment in the custody of the North Carolina Department of Correction as required by N.C. Gen. Stat. § 90-95(h)(4)b. The trial court also required Defendant to pay a $100,000.00 fine. From this judgment, Defendant appeals.

---

4. The jury found Defendant not guilty of possession with intent to sell or deliver Percocet, which was charged in File No. 06 CRS 60688.

5. In addition to the convictions discussed in the text, the trial court included two convictions for possession of Schedule II controlled substances from File No. 06 CrS 60688 in the list of offenses for which Defendant was being sentenced in the consolidated judgment. After careful study of the record, we believe that the trial court's decision to include these two counts in the list of offenses for which Defendant was sentenced in the consolidated judgment to reflect a clerical error. In the indictment returned against Defendant in File No. 06 CrS 60688, the grand jury charged Defendant with possessing Lortab, Percocet, and Oxycodone, all of which are Schedule II substances, with the intent to sell and deliver. The record reveals, however, that the trial court dismissed the Lortab possession count in response to Defendant's motion; that the jury acquitted Defendant of possessing Percocet; and that the trial court arrested judgment following Defendant's conviction for possessing Oxycodone with the intent to sell and deliver. We see no basis in the record for including two counts of possessing a Schedule II controlled substance with the intent to sell and deliver in File No. 06 CrS 60688 in the list of convictions for which Defendant was being sentenced in the judgment imposed by the trial court. Even though Defendant does not raise this argument on appeal, we exercise our discretion under N.C.R. App. P. 2 to address this error. *See State v. Owens*, 160 N.C. App. 494, 498, 586 S.E.2d 519, 522 (2003) (addressing an error not raised by the defendant on appeal, pursuant to N.C.R. App. P. 2, regarding a trial court's judgment convicting the defendant of both felonious larceny and illegal possession based on the taking and possession of the same items, which was inconsistent with *State v. Perry*, 305 N.C. 225, 236-37, 287 S.E.2d 810, 817 (1982), and ruling that the consolidation of the convictions for judgment did not "cure the error"). As a result, we request the trial court to examine the record and, as appropriate, correct the judgment entered against Defendant on remand to the extent that these two offenses should not have been included in the list of convictions for which Defendant was being sentenced.

We grant Defendant a new trial on certain charges based on our belief that the trial court erred by (1) allowing the admission of evidence relating to prior bad acts for which Defendant had been acquitted and (2) admitting testimony identifying certain drugs as controlled substances based on a visual identification process. As a result, we remand this case to the trial court for a new trial on certain charges and modification of the judgment entered against Defendant to reflect the outcome of any new trial conducted with respect to these charges and any other corrections that should be made to the judgment in light of our decision.

## I: Factual Background

On 22 August 2006, Mandy Pope (Pope) visited the New Hanover County Sheriff's Office for the purpose of discussing Defendant's drug-related activities with law enforcement officers. Pope had known Defendant for approximately two and one-half years, and had purchased prescription pain medications for her own use and that of her mother from him on a regular basis.

At the request of Officer Chris Robinson (Officer Robinson), Pope telephoned Defendant and arranged to meet him for the purpose of buying pain medications. Pope was provided with a recording device, which she carried in her purse, and $300, part of which was to be used in her transaction with Defendant.

Officer Nancy Willaford (Officer Willaford) accompanied Pope to Carolina Beach Exxon in a minivan. Defendant met them there in a black Monte Carlo. Pope got out of the minivan and entered the car driven by Defendant, while Officer Willaford stayed in the minivan.

Following a short conversation with Pope, Defendant exited the Monte Carlo and opened the trunk. Upon returning to the passenger compartment, Defendant sold thirty blue, oval-shaped pills to Pope for $180. Pope testified that the pills she purchased from Defendant were Lorcets. Before leaving, Pope agreed to meet Defendant for sex in an hour.

After Defendant drove away, Pope and Officer Willaford returned to the New Hanover County Sheriff's Office. The thirty blue, oval-shaped pills that Pope received from Defendant were turned over to the officers. At that point, Officer Robinson procured a warrant for Defendant's arrest. A search warrant for Defendant's home, which was located at 6514 Myrtle Grove Road, was issued on the following day.

As investigating officers undertook surveillance of Defendant's home, Officer Robinson identified Defendant as the driver of a vehicle outside the residence and conducted an investigatory stop of that vehicle. The officers discovered three pill bottles and a small amount of cash on Defendant's person at that time. One pill bottle bore Defendant's name, and another bore the name of Manuel Ward.

According to Defendant, the car was owed by Manuel Ward, his cousin from California. Defendant denied knowing what was in the trunk, stated that the trunk was broken, and claimed that he did not have access to it. A search of the trunk resulted in the seizure of several bottles containing various substances and cash. In addition, another prescription bottle and additional cash were discovered below the carpeting in the trunk.

A subsequent search of Defendant's home revealed the presence of prescription bottles bearing several different names, some of which contained pills and others which did not; a white, rock-like substance, which was later identified as cocaine; digital scales with a chalky residue; fictitious identification cards; and firearms. A prescription bottle bearing the name of Manuel Ward that contained ninety-three pills was seized from a large storage shed outside Defendant's home.

At trial, Special Agent Irvin Lee Allcox (Special Agent Allcox), a chemist employed by the State Bureau of Investigation, testified as an expert in the field of the chemical analysis of drugs and forensic chemistry. Special Agent Allcox testified that he performed a chemical analysis or visual examination of the evidence seized from Defendant, Defendant's car, Defendant's home, and the storage shed outside Defendant's home. According to Special Agent Allcox, these substances included Cocaine, Dihydrocodeinone (an opium derivative), Hydrocodone (an opium derivative), Oxycodone (an opium derivative)[6], Amphetamine (Adderall), Alprazolam (Xanax), Diazepam (Valium), Carisoprodol (Soma)[7], and Methylphenidate (Ritalin). Special Agent Allcox identified certain of the seized substances based upon a chemical analysis.[8] However, Special Agent

---

6. Special Agent Allcox testified that Percocet was a combination of Oxycodone and acetaminophen.

7. Carisoprodol (Soma) is not a controlled substance.

8. Special Agent Allcox identified the following drugs based on a chemical analysis: three grams of Cocaine; one-hundred and twenty-five tablets of Dihydrocodeinone (an opium derivative) discovered on Defendant's person, in his bedroom, in a shed outside his residence, or in the trunk of his car on 23 August 2006; eighty-five tablets of

Allcox identified certain other substances on the basis of a visual examination of the size, shape, color of and markings on the tablets in question.[9]

Defendant denied possessing most of the drugs found at 6514 Myrtle Grove Road. Defendant testified that the drugs might have belonged to Manuel Ward or Manuel Ward's girlfriend. Defendant claimed to have last seen Manuel Ward not long before his arrest. In addition, Manuel Ward's sister, Pearl Bellerose (Bellerose), testified that Manuel Ward left Wilmington fifteen years before the trial, came back to Wilmington seven to eight months prior to the trial, and then returned to Spokane, Washington. Defendant also presented evidence tending to show that he had filled prescriptions at local pharmacies, including multiple refills for Oxycodone and Hydrocodone. According to Defendant, some of the bottles seized on 23 August 2006 contained his personal prescription medications.

## II: Procedural History

On 23 and 24 August 2006, warrants for arrest were issued charging Defendant with six counts of trafficking in opium; single counts of maintaining a vehicle and dwelling for the purpose of keeping and selling various prescription medications, possession of cocaine with the intent to sell and deliver, possession of Ritalin with the intent to sell and deliver, possession of Xanax with the intent to sell and deliver, possession of Valium with the intent to sell and deliver, possession of Lortab with the intent to sell and deliver, possession of Percocet with the intent to sell and deliver, possession of Oxycodone with the intent to sell and deliver, possession of Adderall with the intent to sell and deliver, and possession of drug paraphernalia; and two counts of possession of Lorcet with the intent to sell and deliver. On 25 September 2006, the New Hanover County grand jury returned

Hydrocodone (an opium derivative) discovered in the trunk of Defendant's car on 23 August 2006; and thirteen tablets of Amphetamine (Adderall) discovered in the trunk of Defendant's car on 23 August 2006.

9. Special Agent Allcox identified the following drugs based on the visual inspection process discussed later in this opinion: thirty Hydrocodone (an opium derivative) tablets received as a result of the 22 August 2006 transaction between Defendant and Pope; three tablets and tablet fragments of Amphetamine (Adderall) and an undisclosed number of Carisoprodol (Soma) tablets, seized as a result of the search of Defendant's shed and bedroom on 23 August 2006; eighty-three and one-half tablets of Alprazolam (Xanax), fourteen tablets of Diazepam (Valium), and fifteen and one-half tablets of Methylphenidate (Ritalin) seized from Defendant's person on 23 August 2006; and more than 23 tablets of Oxycodone (an opium derivative), five and one-half tablets of Methylphenidate (Ritalin), and an undisclosed amount of Carisoprodol (Soma) seized from the trunk of Defendant's car on 23 August 2006.

**STATE v. WARD**

[199 N.C. App. 1 (2009)]

true bills of indictment charging Defendant with six counts of trafficking in opium, maintaining a dwelling for the purpose of keeping and selling various prescription medications and cocaine, possession of cocaine with the intent to sell and deliver, maintaining a vehicle for the purpose of keeping and selling various prescription medications, possession of Ritalin with the intent to sell and deliver, possession of Xanax with the intent to sell and deliver, possession of Valium with the intent to sell and deliver, possession of Lortab with the intent to sell and deliver, possession of Percocet with the intent to sell an deliver, possession of Oxycodone with the intent to sell and deliver, two counts of possession of Lorcet with the intent to sell and deliver, possession of Adderall with the intent to sell and deliver, and possession of drug paraphernalia.

The cases against Defendant came on for trial at the 7 October 2008 session of the New Hanover County Superior Court. At the conclusion of the State's evidence, the trial court granted Defendant's motion to dismiss the possession of Lortab with the intent to sell and deliver charge, the possession of Lorcet with the intent to sell and deliver charges, and the possession of Adderall with the intent to sell and deliver charge. After hearing all of the evidence and the trial court's instructions, the jury convicted Defendant of six counts of trafficking in opium, maintaining a dwelling for keeping or selling controlled substances, possession of cocaine, maintaining a vehicle for keeping or selling controlled substances, possession of Ritalin with the intent to sell or deliver, possession of Xanax with the intent to sell or deliver, possession of Valium with the intent to sell and deliver, possession of Oxycodone with the intent to sell or deliver, and possession of drug paraphernalia. On the other hand, the jury acquitted Defendant on the possession of Percocet with the intent to sell and deliver charge. After arresting judgment in the Oxycodone possession charge, the trial court consolidated all of Defendant's convictions for judgment and imposed the mandatory sentence for individuals convicted of trafficking in opium in an amount between 14 and 28 grams required by N.C. Gen. Stat. § 90-95(h)(4)b. Defendant noted an appeal to this Court from the trial court's judgment.

### III:  Substantive Legal Analysis

#### A:  Admissibility of Prior Bad Act Evidence

Defendant first contends that the trial court erred by admitting evidence of certain prior bad acts allegedly committed by Defendant contrary to N.C. Gen. Stat. § 8C-1, Rule 404(b). More specifically,

Defendant challenges the admission of evidence relating to evidence seized at the time of his 10 February 2005 arrest for alleged violations of the controlled substance laws similar to those under consideration in this case. After careful consideration, we conclude that the trial court erred by admitting evidence that Defendant possessed certain prescription medications on that occasion and that Defendant is entitled to a new trial in the cases with which he has been charged with prescription drug-related offenses.[10]

## 1: General Principles of Rule 404(b) Analysis

N.C. Gen. Stat. § 8C-1, Rule 404(b), has been characterized as a "general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but one *exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature . . . charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990) (emphasis in the original). Even so, given "the perils inherent in introducing [evidence of] prior crimes under Rule 404(b), several constraints have been placed on the admission of such evidence." *State v. Carpenter*, 361 N.C. 382, 388, 646 S.E.2d 105, 110 (2007).

First, in order for evidence relating to the prior crime to be admissible under N.C. Gen. Stat. § 8C-1, Rule 404(b), it must have some relevance to the issue of the defendant's guilt of the crime for which he or she is on trial. N.C. Gen. Stat. § 8C-1, Rule 401 (2005) (stating that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). As noted above, however, the evidence in question must be relevant to some issue other than the defendant's "propensity

---

10. In addition to the arguments discussed in the text, Defendant also contends that evidence seized in connection with his 10 February 2005 arrest was obtained as the result of an unconstitutional search and seizure and should have been excluded pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 20 of the North Carolina Constitution. In response, the State contends that Defendant has not properly preserved this issue for appellate review and that the 10 February 2005 search and seizure was conducted consistently with applicable constitutional standards. This Court has previously upheld the lawfulness of the search and seizure that made the evidence that is the subject of this portion of Defendant's challenge to his convictions available to the State. *State v. Ward* (No. COA08-5240) (2009). As a result, for the reasons set forth in our decision rejecting Defendant's search and seizure claim in connection with his earlier appeal, we conclude that the challenged evidence was not obtained as the result of an unconstitutional search and seizure.

or disposition to commit an offense of the nature . . . charged." *Coffey*, 326 N.C. at 278-79, 389 S.E.2d at 54.

In addition, otherwise relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . or [by] needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403. The decision as to whether to exclude evidence under N.C. Gen. Stat. § 8C-1, Rule 403 is committed to the trial court's discretion. *Coffey*, 326 N.C. at 281, 389 S.E.2d at 56. A discretionary decision made by a trial judge under N.C. Gen. Stat. § 8C-1, Rule 403 will be left undisturbed on appeal unless it "is manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision." *State v. Syriani*, 333 N.C. 350, 379, 428 S.E.2d 118, 133 (1993).

Finally, "the rule of inclusion described in *Coffey* is constrained by the requirements of similarity and temporal proximity." *State v. al-Bayyinah*, 356 N.C. 150, 155, 567 S.E.2d 120, 123 (2002). In order to satisfy the "similarity" requirement, evidence of a prior bad act must constitute "substantial evidence tending to support a reasonable finding by the jury that the defendant committed the similar act." *State v. Stager*, 329 N.C. 278, 303, 406 S.E.2d 876, 890 (1991) (quotation omitted). A prior act or crime is " 'similar' if there are 'some unusual facts present in both crimes[.]' " *Stager*, 329 N.C. at 304, 406 S.E.2d at 890 (citations omitted). "[R]emoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admissibility." *Stager*, 329 N.C. at 307, 406 S.E.2d at 893.

### 2: Evidence Admitted by Trial Court

Prior to trial, Defendant filed a motion *in limine* seeking the exclusion of evidence concerning evidence obtained in connection with his 10 February 2005 arrest, which led to his subsequent indictment, pursuant to N.C. Gen. Stat. §§ 8-C, Rules 401, 402, 403, 404(b), and 608(b). In his motion *in limine*, Defendant contended that the evidence in question lacked probative value and that its admission would be unduly prejudicial. More specifically, the motion *in limine* alleged that:

Evidence of any prior bad act or acts of the Defendant, Jimmy Waylon Ward, will have no probative value toward the issue of

this particular case and will only go to prejudice the jury against the Defendant, Jimmy Waylon Ward. In addition, our rules of evidence would not allow such a statement to be entered [in]to evidence and the admittance of which evidence would be prejudicial error.

In arguing this motion, Defendant pointed out that the trial judge had dismissed some of the charges arising from his 10 February 2005 arrest for evidentiary insufficiency and contended that it was inappropriate for the State to be allowed to present evidence of prior bad acts that resulted in charges which were eventually dismissed as lacking adequate evidentiary support.

The trial court allowed Defendant's motion *in limine* in part and denied it in part, stating that "I'm going to allow the testimony with regards to . . . what the search revealed of his house and the prescription containers . . . in the house. I'm going to allow the motion . . . as to the firearms, and order the State not to make reference . . . to the firearms found in the previous case." The trial court denied Defendant's motion relating to the evidence seized from Defendant's person on 10 February 2005, thus allowing the admission into evidence of testimony that police "found in [Defendant's] pocket two black containers, one containing nine pills, [and] the other containing several pieces of crack cocaine." When asked whether the officer would be able to testify as to "what [he thought] was" in the prescription containers, the trial court responded, "[h]e'll be able to testify [as to] what was . . . on the labels" of the prescription bottles. However, the trial court specifically denied the officer the right to "talk[] about his conclusions as to what [actual drugs were contained in the prescription bottles];" instead, the trial court stated that "[the officer will] be able to say, 'I found these,' and that's where the inquiry ends. . . . He's not going to say, 'I've looked at the PDR (Physician's Desk Reference) and . . . this pill looks like this, which has been identified as [a certain prescription drug]." According to the trial court, the evidence admitted pursuant to the trial court's ruling showed Defendant's "intent, his knowledge, and . . . a plan, which would be admissible." The trial court also concluded that "the probative value [of the evidence] outweigh[ed] any unfair prejudice to the defendant." After admitting the disputed evidence, the trial court instructed the jury that testimony regarding the events that occurred at and about the time of Defendant's 10 February 2005 arrest was "received solely for the purpose of showing that the defendant had the intent, which is a necessary element of some of the crimes charged in these cases,

and that there existed in the mind of the defendant a plan, scheme, system or design involving the crimes charged in these cases.[11]"

In light of the trial court's ruling, the State presented the testimony of Jonathan Hart, a sergeant with the New Hanover County Sheriff's Department (Sergeant Hart). Sergeant Hart testified, in pertinent part, that he went to Defendant's residence, which was then located at 620 Inlet Acres, on 10 February 2005 as part of an investigation into complaints that Defendant possessed narcotics. As he approached Defendant's residence, he observed Defendant driving a white Dodge Caravan away from that location. After stopping Defendant and initiating a search of his person, Sergeant Hart found two small black pill containers, one of which contained six blue oval pills and three white round tablets and the other of which contained several pieces of crack cocaine. At the time he was stopped, Defendant presented a driver's license with the name of Manuel Ward. Defendant continued to claim to be Manuel Ward until after he was processed. A subsequent search of Defendant's residence resulted in the seizure of a digital scale and numerous prescription bottles, "some with labels" and "some without," and three black containers. Sergeant Hart testified that Defendant stated that there was 2.8 grams of crack cocaine in one of the black containers, 1.2 grams of crack cocaine in the second black container, and .3 grams of crack cocaine in the third black container. According to Sergeant Hart, the prescription bottles that he seized in Defendant's residence included a bottle that lacked patient information containing 19 white round tablets and was labeled as containing Trazedone; a bottle bearing the name of Manuel Ward containing 37 white round tablets and labeled as containing Soma; a prescription bottle bearing "the name of Jason King" containing 26 orange oval tablets and labeled as containing Adderall; a bottle bearing the name of Manuel Ward containing 18 blue oval tablets and labeled as containing Hydrocodone; a prescription bottle bearing the name of Jean Duncan containing eight round blue tablets and labeled as containing Xanax; a prescription bottle bearing Defendant's name containing twelve round white tablets and labeled as containing Oxycodone; and a prescription bottle bearing the name of Manuel Ward and labeled as containing Hydrocodone.

---

11. In his instructions to the jury at the conclusion of all the evidence, the trial court made a slight modification to the list of purposes for which the jury was allowed to consider the evidence in question. At that time, the trial court instructed the jury that it could consider the disputed evidence for the purposes of showing identity, intent, and the existence of a common plan or scheme.

As the result of this incident, Defendant was charged with possession of cocaine with the intent to sell and deliver, possession of drug paraphernalia, maintaining a dwelling for keeping or selling drugs, possession of Adderall, possession of Valium, possession of Hydrocodone, possession of Xanax, and resisting arrest by providing identification bearing the name of Manuel Ward rather than his own. During the course of Defendant's trial on these charges, the trial judge dismissed the possession of drug paraphernalia, possession of Valium, possession of Hydrocodone, possession of Adderall, possession of Xanax, and resisting arrest charges due to the insufficiency of the State's evidence to support a conviction.[12] Subsequently, the jury convicted Defendant of possessing cocaine with the intent to sell and deliver and maintaining a dwelling for the keeping and selling of cocaine. This Court upheld Defendant's convictions in an unreported opinion filed on 17 March 2009. *State v. Ward* (No. COA08-524) (2009).

### 3: Application of Traditional Rule 404(b) Analysis

**[1]** On appeal, Defendant argues that "the State was collaterally estopped from submitting any evidence at his trial for the August 2006 offenses concerning the charges [the trial court previously] dismissed for insufficiency of the evidence." In support of this assertion, Defendant relies on *State v. Solomon*, 117 N.C. App. 701, 704, 453 S.E.2d 201, 203 (1995), and *State v. Agee*, 326 N.C. 542, 391 S.E.2d 171 (1990). As a result, the principal argument that Defendant has advanced on appeal with respect to the admissibility of the evidence obtained as a result of his 10 February 2005 arrest rests on collateral estoppel principles.

In *Solomon*, this Court quoted the decision of the United States Supreme Court in *Ashe v. Swenson*, 397 U.S. 436, 443, 25 L. Ed. 2d 469, 475 (1970), for the proposition "that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Solomon*, 117 N.C. App. at 704, 453 S.E.2d at 203. The *Solomon* Court applied this principle in examining the admissibility of evidence pertaining to charges for which a defendant had previously been acquitted. In *Solomon*, an officer searched the defendant's vehicle and discovered a cigarette case containing rolling papers, marijuana, cocaine powder, and part of a marijuana cigarette. The defendant was acquitted in District Court of possession of marijuana

---

12. Sergeant Hart admitted as much on cross-examination.

and possession of drug paraphernalia; the defendant's trial in Superior Court addressed the issue of his guilt of possession of cocaine. This Court held that the trial court did not err by admitting evidence of the defendant's possession of marijuana and rolling papers during the Superior Court proceeding despite the defendant's acquittal of marijuana possession and possession of drug paraphernalia in the District Court because the challenged evidence formed an "integral and natural part of an account of the [defendant's] crime" of possession of cocaine. *Solomon*, 117 N.C. App. at 706, 453 S.E.2d at 205.

In *State v. Agee*, 326 N.C. 542, 391 S.E.2d 171 (1990), our Supreme Court reached a similar result. In *Agee*, the Supreme Court upheld the admission of evidence that the defendant possessed marijuana in a case arising out of the same incident in which the defendant was charged with possessing LSD even though he had been acquitted of possessing marijuana at an earlier proceeding. In reaching this conclusion, the Court stated:

> Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or [if it] forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.

*Agee*, 326 N.C. at 548, 391 S.E.2d at 174 (quoting *United States v. Williford*, 764 F.2d 1493, 1499 (1985)). However, the admissibility of evidence "form[ing] an integral and natural part of an account of the crime" is still "subject to the weighing of probative value versus unfair prejudice mandated by Rule 403." *Agee*, 326 N.C. at 549, 391 S.E.2d at 175. According to the Supreme Court, "[b]ecause the evidence of defendant's marijuana possession served the purpose of establishing the chain of circumstances leading up to his arrest for possession of LSD, Rule 404(b) did not require its exclusion as evidence probative *only* of defendant's propensity to possess illegal drugs." *Agee*, 326 N.C. at 550, 391 S.E.2d at 175-76 (emphasis in original).

Both *Agee* and *Solomon* involve instances in which the same essential evidence underlay charges that were subject to adjudication in two separate trials. In each instance, the facts underlying the charges for which the defendant had been acquitted were an "integral and natural part of an account of the [defendant's] crime[.]" The same cannot be said for the facts at issue here, which relate to a seizure

that occurred on an entirely different occasion. For that reason, we do not find either *Agee* or *Solomon* directly relevant to the present controversy. As a result, we will first examine the challenged evidence in light of the principles traditionally employed in evaluating challenges to evidence admitted pursuant to N.C. Gen. Stat. § 8C-1, Rule 404(b), which focus on the similarity between the prior incident and the incident that underlies the current charges against the defendant. *See Dowling v. United States*, 493 U.S. 342, 348, 107 L. Ed. 2d 708, 717 (1990) (holding that a prior acquittal does not preclude the admission of evidence of a defendant's other alleged crimes in a prosecution for the bank robbery on the basis of collateral estoppel principles "because . . . the prior acquittal did not determine an ultimate issue in the present case").

To be sure, the events of 10 February 2005 and 22-23 August 2006 were not absolutely identical. For example, the charges that resulted from Defendant's 10 February 2005 arrest did not rise to the level of trafficking.[13] Furthermore, the residence searched on 10 February 2005 arrest was located on Inlet Acres Drive instead of Myrtle Grove Road. As a result, there were certainly some differences between the facts at issue in connection with Defendant's 10 February 2005 arrest and the facts underlying the charges before the trial court and jury in this case.

On the other hand, these dissimilarities pale in comparison to the numerous similarities between the two sets of facts. For example, in each instance, quantities of crack cocaine and items that appeared to be prescription drugs were seized from Defendant. Defendant had numerous prescription bottles, some of which bore Defendant's name and some of which bore other names, on his person and in his residence on both occasions. On both occasions, Defendant carried identification bearing his own name and that of Manuel Ward, including identification bearing Manuel Ward's name and Defendant's picture. Defendant claimed that someone else owned the drugs seized from him on both 10 February 2005 and 23 August 2006. Defendant was found in possession of digital scales in both residences. The two sets of events occurred about a year and a half apart and in the same county. As a result, there were also substantial similarities and a relatively short interval between the events of 10 February 2005 and 22-23 August 2006.

13. In the present cases, Defendant was charged with trafficking in opium by sale, transportation, and possession on 22 August 2006 in File No. 06 CrS 60670 and by manufacturing, possession, and transportation on 23 August 2006 in File No. 06 CrS 60685.

After careful consideration of the evidentiary record, we con-
clude that the substantial similarities between the two sets of events
and the relatively short lapse of time between these incidents renders
the introduction of evidence relating to the seizures made from
Defendant's person and residence on 10 February 2005 at a trial
arising from the events that occurred on 23 August 2006 permis-
sible under N.C. Gen. Stat. § 8C-1, Rule 404(b), for the purpose of
showing intent, knowledge, identity and the existence of a common
plan or scheme to engage in the unlawful sale of controlled sub-
stances in New Hanover County. *State v. Stevenson*, 169 N.C. App.
797, 611 S.E.2d 206 (2005) (upholding admission in a trial in which the
defendant was charged with possession of cocaine with the intent to
sell and deliver of evidence describing incidents in which the defend-
ant possessed cocaine in the same location and acted in the same
general manner).

### 4: Rule 403 Analysis

**[2]** Although the disputed evidence meets the standards for admissi-
bility enunciated in N.C. Gen. Stat. § 8C-1, Rule 404(b), we must still
examine the extent to which this evidence should be excluded pur-
suant to N.C. Gen. Stat. § 8C-1, Rule 403. In *State v. Scott*, 331 N.C. 39,
413 S.E.2d 787 (1992), the Supreme Court stated in requiring the
exclusion of evidence otherwise admissible pursuant to N.C. Gen.
Stat. § 8C-1, Rule 404(b) under N.C. Gen. Stat. § 8C-1, Rule 403, that:

> [W]here the probable value of such evidence depends upon
> defendant's having in fact committed the prior alleged offense,
> his acquittal of the offense in an earlier trial so divests the evi-
> dence of probative value that, as a matter of law, it cannot out-
> weigh the tendency of such evidence unfairly to prejudice the
> defendant. Such evidence is thus barred by N.C. R. Evid. 403.

*Id.*, 331 N.C. at 41, 413 S.E.2d at 788. According to the Supreme Court,
this holding rested "on the proposition that the presumption of inno-
cence continues with the defendant after his acquittal and so erodes
the probative value of the evidence of the previous crime that it is
more prejudicial than probative, making it inadmissible under
N.C.G.S. § 8C-1, Rule 403." *State v. Lynch*, 337 N.C. 415, 419, 445
S.E.2d 581, 582 (1994).[14]

---

14. The principle enunciated in *Scott* does not bar the admission of testimony
relating to other bad acts for which the defendant was acquitted if the other bad acts
and the crime charged were "part of a single continu[ous] transaction." *State v. Bell*,
164 N.C. App. 83, 87-88, 594 S.E.2d 824, 826-27 (2004).

Although the principle set forth in *Scott* would not operate to bar the presentation of evidence that Defendant possessed cocaine and digital scales on 10 February 2005 given Defendant's subsequent conviction for possession of cocaine with the intent to sell and deliver and possession of drug paraphernalia, *See Stager*, 329 N.C. at 303, 406 S.E.2d at 890 (holding that a prior conviction may be a bad act for purposes of Rule 404(b) if substantial evidence supports a finding that defendant committed both acts, and the "probative value is not limited solely to tending to establish the defendant's propensity to commit a crime such as the crime charged"), it does operate the bar the presentation of evidence tending to show that Defendant possessed various prescription drugs which he was acquitted of possessing. *State v. Allen*, 144 N.C. App. 386, 388, 548 S.E.2d 554, 555 (2001) (holding that the dismissal of criminal charges for evidentiary insufficiency is an acquittal for purposes of the double jeopardy clause). After careful review of the evidence and the applicable law, we conclude that the relevance of evidence that Defendant possessed various types of prescription medications on 10 February 2005 under each of the theories enunciated by the trial court in deciding that the evidence should be admitted hinges on a finding that Defendant did, in both instances, possess unlawful controlled substances, rendering that evidence inadmissible under the principle enunciated in *Scott*.[15] We will now explain our reasons for reaching this conclusion in more detail.

Among the charges lodged against Defendant arising from the events of 22-23 August 2006 were accusations that Defendant possessed various prescription drugs with the intent to sell and deliver. For that reason, several of the charges for which the Defendant was on trial in this case included a specific intent element. "Where a specific mental intent or state is an essential element of the crime charged, evidence may be offered of such acts or declarations of the accused as tend to establish the requisite mental intent or state, even though the evidence discloses the commission of another offense by the accused." *State v. McClain*, 240 N.C. 171, 175, 81 S.E.2d 364, 366 (1954). As a result, evidence tending to show that Defendant possessed prescription medications with the intent to sell or deliver on other occasions would clearly support a conclusion that Defendant possessed the requisite intent at the time of the alleged commission of the offenses charged. *State v. Morgan*, 329 N.C. 654, 661, 406

---

15. Admittedly, the only theories that were mentioned in the trial court's instructions to the jury were identity, intent, and common plan or scheme. However, we will address the knowledge issue as well in the interests of completeness.

**STATE v. WARD**

[199 N.C. App. 1 (2009)]

S.E.2d 833, 837 (1991). However, the mere fact that Defendant possessed a collection of miscellaneous bottles containing a variety of unidentified pills would not tend to show that Defendant possessed the required mental state. Thus, the probative value of the evidence that prescription medications were seized from Defendant on 10 February 2005 for purposes of showing Defendant's intent on 22-23 August 2006 "depends upon [his] having . . . committed the prior alleged offenses." *Scott*, 331 N.C. at 41, 413 S.E.2d at 788.

Similarly, in order to be guilty of unlawfully possessing prescription medications, Defendant had to know the identity of the substances in question. *State v. Weldon*, 314 N.C. 401, 403, 333 S.E.2d 701, 702-03 (1985). "Where guilty knowledge is an essential element of the crime charged, evidence may be offered of such acts or declarations of the accused as tend to establish the requisite guilty knowledge, even though the evidence reveals the commission of another offense by the accused." *McClain*, 240 N.C. at 175, 81 S.E.2d at 367. For that reason, evidence tending to show that Defendant unlawfully possessed prescription medications on prior occasions tends to show the existence of the requisite guilty knowledge on 22-23 August 2006. *Weldon*, 314 N.C. at 403, 333 S.E.2d at 703. On the other hand, evidence that Defendant possessed a collection of miscellaneous bottles containing unidentified pills does not tend to show that Defendant had the requisite knowledge. Thus, the probative value of evidence that various prescription medications were seized in connection with Defendant's 10 February 2005 arrest for purposes of showing that he had the requisite guilty knowledge on 22-23 August 2006 "depends upon [his] having in fact committed the prior alleged offense." *Scott*, 331 N.C. at 41, 413 S.E.2d at 788.

In addition, "[w]here the accused is not definitely identified as the perpetrator of the crime charged and the circumstances tend to show that the crime charged and another offense were committed by the same person, evidence that the accused committed the other offense is admissible to identify him as the perpetrator of the crime charged." *McClain*, 240 N.C. at 175, 81 S.E.2d at 367. Thus, evidence that Defendant unlawfully possessed prescription drugs on both 10 February 2005 and 22-23 August 2006 might tend to identify him as the individual who possessed those drugs on both occasions. *State v. Reid*, 175 N.C. App. 613, 624, 625 S.E.2d 575, 584 (2006) (holding that evidence that the defendant and a witness sold drugs together was relevant to prove how the witness knew the defendant). However, evidence that Defendant possessed various bottles and a collection of

unidentified pills on 10 February 2005 does not tend to show that he was the individual who possessed a variety of prescription medications on 22-23 August 2006. As a result, "the probative value of" evidence relating to the seizure of prescription medications at the time of Defendant's 10 February 2005 arrest "depends upon [his] having in fact committed the prior alleged offense." *Scott,* 331 N.C. at 41, 413 S.E.2d at 788.

Finally, "[e]vidence of other crimes is admissible when it tends to establish a common plan or scheme embracing the commission of a series of crimes so related to each other that proof of one or more tends to prove the crime charged and to connect the accused with its commission." *McClain,* 240 N.C. at 176, 81 S.E.2d at 367. As a result, evidence that Defendant was involved in a long-standing plan to possess and sell or deliver prescription medications as evidenced by proof of the commission of prior bad acts is, under this State's decisional law, admissible for the purpose of proving that Defendant possessed prescription drugs with the intent to sell and deliver on 22-23 August 2006 in furtherance of that same common plan or scheme. *State v. Houston,* 169 N.C. App. 367, 372-73, 610 S.E.2d 777, 781-82 (2005), *disc. review denied and appeal dismissed,* 359 N.C. 639, 617 S.E.2d 281 (2005) (holding evidence of uncharged prior cocaine sales with numerous similarities to those for which the defendant was on trial admissible for, among other purposes, showing the existence of a common plan involving the prior sales and the transactions which were the subject of the charges pending against the defendant). Evidence that Defendant possessed a number of miscellaneous bottles and a collection of unidentified pills would not tend to show the existence of such a common scheme or plan. Thus, "the probative value of" evidence relating to items seized as part of Defendant's 10 February 2005 arrest "depends upon [his] having in fact committed the prior alleged offense." *Scott,* 331 N.C. at 41, 413 S.E.2d at 788.

In summary, for the reasons stated above, we hold that each of the reasons listed by the trial court as justifications for the admission of the disputed evidence hinged upon a determination that Defendant actually committed an offense for which he was later acquitted. Thus, the trial court contravened the principle enunciated in *Scott* by admitting evidence that Defendant possessed Adderall, Hydrocodone, Oxycodone, and Xanax at the time of his arrest on 10 February 2005.

### 5: Prejudice

[3] Finally, we must now determine the extent to which "there is a reasonable possibility that, had the error not been committed, a dif-

ferent result would have been reached at trial." *Scott*, 331 N.C. at 46, 413 S.E.2d at 791; *see also State v. Fluker*, 139 N.C. App. 768, 776, 535 S.E.2d 68, 73-74 (2000) (holding that the erroneous admission in a misdemeanor larceny case of evidence elicited on cross-examination that the defendant had been detained in another store, resulting in charges for which she was later acquitted, was harmless given the overwhelming evidence against the defendant); *State v. Robinson*, 115 N.C. App. 358, 362, 444 S.E.2d 475, 477 (1994) (holding that, in a felonious breaking or entering and possession of housebreaking implements case, the erroneous admission of evidence that the defendant had committed a similar breaking or entering on another occasion, for which he was later acquitted, constituted harmless error given the overwhelming evidence of the defendant's guilt). After careful consideration, we are unable to ascertain how the erroneous admission of evidence that Defendant possessed various types of prescription medications on 10 February 2005 would have affected his convictions for possession of or trafficking in unrelated substances such as cocaine or opium.[16]

In addition, we are unable to see how the admission of this evidence would have prejudiced Defendant's chances for a more favorable verdict on the possession of drug paraphernalia charge given that the alleged drug paraphernalia did not include items usually associated with the possession or use of prescription medications. However, given the relatively close connection in time and the general similarity of the prescription medications possessed on both occasions, we believe that there is a reasonable possibility that the erroneous admission of the evidence that various prescription medications were seized from Defendant on 10 February 2005 affected his chances for a more favorable outcome in the cases in which he was convicted of possessing Ritalin, Xanax, and Valium with the intent to sell and deliver and the cases in which Defendant was convicted of maintaining a dwelling and a vehicle for the purpose of keeping and

---

16. Although Defendant's trafficking in opium convictions relating to events occurring on 22 August 2006 in File No. 06 CrS 60670 involved substances identified by Special Agent Allcox as Hydrocodone, we vacate Defendant's convictions in File No. 06 CrS 60670 for other reasons and so need not determine the extent to which the trial court's erroneous admission that Defendant possessed a bottle labeled as containing Hydrocodone on 10 February 2005 necessitates an award of appellate relief. In addition, as we understand the record, there is evidence of Defendant's involvement with a sufficient quantity of opiates other than Hydrocodone on 23 August 2006 to render the trial court's error in admitting evidence that Defendant possessed a bottle labeled as containing Hydrocodone on 10 February 2005 harmless for purposes of File No. 06 CrS 60685.

selling various drugs, including prescription medications. In reaching this conclusion, we rely upon a number of factors, such as the inherently subjective nature of a determination of Defendant's intent and the fact that Defendant denied possessing certain of the controlled substances in question. As a result, we conclude that Defendant is entitled to a new trial in the cases in which he is charged with possession of Ritalin with the intent to sell and deliver, possession of Xanax with the intent to sell and deliver, possession of Valium with the intent to sell and deliver, maintaining a vehicle for keeping and selling controlled substances, and maintaining a dwelling for keeping and selling controlled substances.

## B: Identification of Controlled Substances by Visual Inspection

[4] Defendant next contends that the trial court erred by allowing an expert witnesses to identify certain substances allegedly found in his possession as controlled substances on the basis of a visual examination rather than a chemical analysis. After careful consideration of the briefs and record, we agree with Defendant's challenge to the admission of this expert testimony.

### 1: Legal Framework Governing Admission of Expert Testimony

N.C. Gen. Stat. § 8C-1, Rule 702(a) provides that, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." *Id.* The Supreme Court established a three-step inquiry for use in evaluating the admissibility of expert testimony in *State v. Goode*, 341 N.C. 513, 461 S.E.2d 631 (1995):

(1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?

*Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (citing *Goode* at 527-29, 461 S.E.2d at 639-41). As a result of the fact that Defendant has not challenged Special Agent Allcox's qualifications in the field of the chemical analysis of drugs and forensic chemistry and the fact that correctly identifying the relevant drugs was critical to the State's case against Defendant, the remainder of our analysis necessarily focuses on issues revolving around the first step specified in *Goode*.

In examining the reliability of the challenged method of proof employed by Special Agent Allcox, "a court may look to testimony by an expert specifically relating to the reliability, may take judicial notice, or may use a combination of the two." *Goode*, 341 N.C. at 530, 461 S.E.2d at 641. "Initially, the trial court should look to precedent for guidance in determining whether the theoretical or technical methodology underlying an expert's opinion is reliable." *Howerton*, 358 N.C. at 459, 597 S.E.2d at 687. "[W]e do not adhere exclusively to the formula, enunciated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and followed in many jurisdictions, that the method of proof 'must be sufficiently established to have gained general acceptance in the particular field in which it belongs.'" *State v. Pennington*, 327 N.C. 89, 98, 393 S.E.2d 847, 852 (1990). However, "when specific precedent justifies recognition of an established scientific theory or technique advanced by an expert, the trial court should favor its admissibility, provided the other requirements of admissibility are likewise satisfied." *Howerton*, 358 N.C. at 459, 597 S.E.2d at 687 (citing *State v. Williams*, 355 N.C. 501, 553-54, 565 S.E.2d 609, 640 (2002)).

In instances in which no precedent is available, our Supreme Court has enunciated the following nonexclusive "indices of reliability" for use in determining whether the expert's proffered scientific or technical method of proof is sufficiently reliable: "the expert's use of established techniques, the expert's professional background in the field, the use of visual aids before the jury so that the jury is not asked 'to sacrifice its independence by accepting [the] scientific hypotheses on faith,' and independent research conducted by the expert." *Howerton*, 358 N.C. at 460, 597 S.E.2d at 687. In describing the manner in which these factors should be applied, the Supreme Court has emphasized the fundamental "distinction between the admissibility of evidence and its weight, the latter of which is a matter traditionally reserved for the jury." *Howerton*, 358 N.C. at 460, 597 S.E.2d at 687 (citing *Queen City Coach Co. v. Lee*, 218 N.C. 320, 323, 11 S.E.2d 341, 343 (1940) (stating that "[t]he competency, admissibility, and sufficiency of the evidence is a matter for the court to determine. [Its] credibility, probative force, and weight is a matter for the jury")).

"[A] trial court's ruling on the qualifications of an expert or the admissibility of an expert's opinion will not be reversed on appeal absent a showing of abuse of discretion." *Howerton*, 358 N.C. at 458, 597 S.E.2d at 686. "An abuse of discretion occurs when a trial judge's ruling is manifestly unsupported by reason." *State v. Summers*, 177

N.C. App. 691, 697, 629 S.E.2d 902, 907 (2006) (citations omitted). As a result, the ultimate issue which the Court must resolve in connection with Defendant's challenge to the admissibility of Special Agent Allcox's testimony identifying certain items as controlled substances using a visual inspection process is whether the trial court abused its discretion by effectively finding that the approach he employed was "sufficiently reliable."

### 2: Procedures Employed by Special Agent Allcox

At trial, Special Agent Allcox testified that he "examined State's exhibit 3-A and . . . made notes of pharmaceutical markings on State's Exhibit 3-A [and other exhibits listed in footnote eight of this opinion] and then used . . . medical literature . . . called Micromedics Literature[,]" a "publication that is used by the doctors in hospitals and pharmacies to identify prescription medicine[s]." According to Special Agent Allcox, the State Bureau of Investigation "subscribe[s] to" the Micromedics Literature and has "been using it in the SBI crime laboratory for the 35 years that [he has] been associated with the crime laboratory." Special Agent Allcox testified that the Micromedics Literature lists "all the pharmaceutical markings to identify the contents, the manufacturer and the type of substances in the tablets[.]" In essence, the approach used by Special Agent Allcox to identify certain of the substances that the State seized from Defendant's person, residence, and outbuilding as controlled substances involved a visual examination of the appearance of and pharmaceutical markings on the medications in question and a comparison of the information derived from that process to information contained in the Micromedics Literature. Special Agent Allcox utilized this analytical approach in rendering opinions that Exhibit 3-A contained Hydrocodone; that Exhibit 26-A-4 contained Amphetamine (Adderall); that Exhibit 26-B-3 contained Alprazolam (Xanax), Diazepam (Valium), and Methylphenidate (Ritalin); that Exhibit 26-B-5 contained Oxycodone; that Exhibit 26-B-6 contained Methylphenidate (Ritalin); and that Exhibit 26-B-9 contained Oxycodone.[17] Defendant's challenge to the admission of that portion of Special Agent Allcox's testimony involving the use of this process presents an issue of first impression in this jurisdiction, which is whether visual identification provides a sufficiently reliable basis for

---

17. Special Agent Allcox performed a chemical analysis on State's Exhibit 26-A-1, which tested positive for cocaine, and Exhibits 26-A-3, 26-B-1, 26-B-4, 26-B-7, 26-B-12, 26-B-13, which tested positive for Dihydrocodeinone or Hydrocodone.

STATE v. WARD

[199 N.C. App. 1 (2009)]

the admission of expert testimony identifying alleged prescription medications as controlled substances.

### 3: Precedent Addressing Admissibility of Visual Identification Testimony Relating to Controlled Substances

The first issue that we must address is examining existing precedent relating to the appropriateness of identifying particular items as controlled substances on the basis of visual analysis. The appellate courts in this jurisdiction have addressed the admissibility of evidence identifying particular items as containing controlled substances on the basis of visual inspection on several occasions. *See State v. Fletcher*, 92 N.C. App. 50, 373 S.E.2d 681 (1988), *State v. Freeman*, 185 N.C. App. 408, 648 S.E.2d 876, 881-82 (2007), *State v. Llamas-Hernandez*, 189 N.C. App. 640, 659 S.E.2d 79 (2008), *rev'd*, 363 N.C. 8, 673 S.E.2d 658 (2009). Not all of these decisions involved testimony from individuals treated as experts; none of them relate to the identification of prescription medications; and none of them involved the exact technique employed by Special Agent Allcox. Even so, we will begin our analysis of the admissibility of Allcox's testimony by examining these decisions, since they do tend to illuminate the analysis that we should utilize in determining the admissibility of the challenged testimony.

In the first of these cases, this Court upheld the admission of testimony by two law enforcement officers that a substance sold to the defendant was marijuana. *Fletcher*, 92 N.C. App. at 58, 373 S.E.2d at 685. The officers, one of whom had been in law enforcement for sixteen and a half years, were permitted to testify as expert witnesses. This Court concluded that the two officers, through "study and experience," were better qualified than the jury to form an opinion as to the identity of the alleged controlled substance, rendering their testimony admissible. However, *Fletcher* was decided before *Goode* and *Howerton*, so we did not evaluate the "reliability" of the procedures employed by the officers and focused almost exclusively on the second *Goode* criterion instead. In reaching this result, the Court reasoned:

> Admittedly, it would have been better for the State to have introduced evidence of chemical analysis of the substance, especially in light of the fact that testimony indicated the State Bureau of Investigation had conducted an analysis. However, the absence of such direct evidence does not, as the appellant suggests, prove fatal. Though direct evidence may be entitled to

much greater weight with the jury, the absence of such evidence does not render the opinion testimony insufficient to show the substance was marijuana.

*Fletcher,* 92 N.C. App. at 57, 373 S.E.2d at 686 (citation omitted). At bottom, we do not believe that *Fletcher* is controlling here in light of the clarification of the required analysis relating to the admissibility of expert testimony worked by *Goode* and the fact that the identification of marijuana is different in both degree and kind from the identification of prescription medications. As a result, this Court's reasoning in *Fletcher* does not justify upholding the methodology employed by Special Agent Allcox as "sufficiently reliable."

A few years later, this Court ruled in *State v. Freeman,* 185 N.C. App. 408, 648 S.E.2d 876 (2007), that the trial court did not err by allowing lay testimony that a substance was crack cocaine, even though the only basis for the officer's identification testimony was his "training and experience." In finding the officer's lay testimony admissible pursuant to N.C. Gen. Stat. § 8C-1, Rule 701, we explained:

Officer Miller testified that two of the pills in the pill bottle seized during defendant's arrest were crack cocaine and that he based his identification of the pills as crack cocaine on his extensive training and experience in the field of narcotics. Officer Miller, who had been with the police department for eight years at the time, testified that he had come into contact with crack cocaine between 500 and 1000 times. As Officer Miller's testimony on this issue was helpful for a clear understanding of his overall testimony and the facts surrounding defendant's arrest, the trial court did not abuse its discretion, much less commit plain error, in permitting Officer Miller to testify as to his opinion that the pills were crack cocaine.

*Freeman,* 185 N.C. App. at 414, 648 S.E.2d at 882. As a result, the effect of *Freeman* was to extend the logic of *Fletcher* from marijuana to crack cocaine.

Shortly thereafter, in *State v. Llamas-Hernandez,* 189 N.C. App. at 640, 659 S.E.2d at 79, the defendant challenged the admission of lay opinion testimony from two detectives to the effect that a particular substance was powder cocaine. A divided panel of this Court upheld the trial court's decision in reliance on *Freeman.* In reaching this result, the majority noted that "the visual characteristics of cocaine in powder form are not unique to that substance alone." *Llamas-*

*Hernandez*, 189 N.C. App. at 646, 659 S.E.2d at 83 (citing Michael D. Blanchard & Gabriel J. Chin, *Identifying the Enemy in the War on Drugs: A , Critique of the Developing Rule Permitting Visual Identification of Indescript White Powder in Narcotics Prosecutions*, 47 Am. U. L. Rev. 557 (1998)). However, after admitting that "the holding in *Freeman* concerns us[,] the majority felt "bound to follow it." *Llamas-Hernandez*, 189 N.C. App. at 647, 659 S.E.2d at 83. In dissent, Judge Steelman noted that the trial court first deprived the State of the ability to introduce a laboratory report concerning the alleged controlled substance as a sanction for a discovery violation, but then allowed the investigating officers to testify that the substance at issue was cocaine. *Id.*, 189 N.C. App. at 651, 659 S.E.2d at 86. Next, Judge Steelman noted that the General Assembly had adopted "a technical, scientific definition of cocaine." *Llamas-Hernandez*, 189 N.C. App. at 652, 659 S.E.2d at 86. More particularly, Judge Steelman noted that:

> There are different definitions of isomers for different controlled substances. For purposes of cocaine, isomer means "the optical isomer or diastereoisomer." N.C. Gen. Stat. § 90-87(14a). Optical isomers are compounds with the same molecular formula but which act in opposite ways on polarized light. *See* Ducor, *New Drug Discovery Technologies and Patents*, 22 Rutgers Computer & Tech. L.J. 369, 379 (footnote 47) (1996). Diastereoisomers are compounds whose molecules are not mirror images but each molecule rotates polarized light. *See* Strong, *FDA Policy and Regulation of Stereoisomers: Paradigm Shift and the Future of Safer, More Effective Drugs*, 54 Food Drug L.J. 463 (1999).

*Llamas-Hernandez*, 189 N.C. App. at 652, 659 S.E.2d at 86. As a result, "[b]y enacting such a technical, scientific definition of cocaine," Judge Steelman concluded that "it is clear that the General Assembly intended that expert testimony be required to establish that a substance is in fact a controlled substance." *Id.*, 189 N.C. App. at 652, 659 S.E.2d at 86. Judge Steelman further reasoned that, given the technical definition of a controlled substance and the existence of statutory procedures for the admission of laboratory reports and the discovery of both those reports and underlying materials, the General Assembly never "intended . . . that an officer could make a visual identification of a controlled substance." *Id.*, 189 N.C. App. at 653, 659 S.E.2d at 87. The Supreme Court reversed this Court's decision in *Llamas-Hernandez* on the basis of Judge Steelman's dissent without further comment. Although the Supreme Court did not directly over-

rule *Freeman*, it is hard to square the result reached in that case with the "technical, scientific definition" logic utilized by Judge Steelman in dissent with the subsequent approval of the Supreme Court. As a result, existing precedent suggests that controlled substances defined in terms of their chemical composition can only be identified through the use of a chemical analysis rather than through the use of lay testimony based on visual inspection.

4: Reliability of Identification Method Employed in this Case

Next, we will employ the *Goode* methodology to evaluate the admissibility of Special Agent Allcox's identification testimony. After careful consideration, we conclude that the approach employed by Special Agent Allcox is not consistent with the general thrust of existing precedent concerning how controlled substances should be identified in criminal trials and that the methodology he utilized is not sufficiently reliable for other reasons as well.

First, we are convinced that the essential logic underlying the Supreme Court's decision in *Llamas-Hernandez* militates against the use of the visual identification approach employed by Special Agent Allcox. Special Agent Allcox identified both Schedule II and Schedule IV controlled substances using this approach in this case. As was the case with the cocaine at issue in *Llamas-Hernandez*, the Schedule II and Schedule IV controlled substances identified by Special Agent Allcox using the challenged methodology have a "technical, scientific definition." For example, N.C. Gen. Stat. § 90-90(1)a defines Schedule II controlled substances to include "[o]pium and opiate and any salt, compound, derivative, or preparation of opium and opiate, excluding apomorphine, nalbuphine, dextorphan, naloxone, naltrexone, and nalmefene and their respective salts, but including" substances such as "Hydrocodone" and "Oxycodone." Moreover, N.C. Gen. Stat. § 90-90(1)b expands the definition of a Schedule II controlled substance to incorporate "[a]ny salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of the substances referred to in paragraph 1 of this subdivision [of N.C. Gen. Stat. § 90-90(1)], except that these substances shall not include the isoquinoline alkaloids of opium." Similarly, N.C. Gen. Stat. § 90-90(2) defines a Schedule II controlled substance as including "[a]ny of the following opiates, including their isomers, esters, ethers, salts, and salts of isomers, whenever the existence of such isomers, esters, ethers, and salts is possible within the specific chemical designation unless specifically exempted or listed in other

schedules[,]" including "[d]ihydrocodeine." Additionally, N.C. Gen. Stat. § 90-90(3) treats "[a]ny material, compound, mixture, or preparation which contains any quantity of the following substances having a potential for abuse associated with a stimulant effect on the nervous system unless specifically exempted or listed in another schedule" as a Schedule II controlled substance, including "[a]mphetamine[,] its salts, optical isomers, and salts of its optical isomers" and "Methylphenidate." Finally, N.C. Gen. Stat. § 90-92(a)(1) provides that, "[u]nless specifically excepted or unless listed in another schedule," the category of Schedule IV controlled substances includes "any material, compound, mixture, or preparation which contains any quantity of the following substances, including its salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:" "Alprazolam" and "Diazepam." A cursory reading of these statutory provisions demonstrates that they define various controlled substances in "technical, scientific" ways, a fact that suggests, consistently with the approach adopted by the Supreme Court in *Llamas-Hernandez*, that identification testimony should rest on a chemical analysis rather than visual identification. Although some of these definitions include references to specific substances such as "Hydrocodone" or "Diazepam," that fact does not exempt such substances from the full force of the logic of the Supreme Court's decision in *Llamas-Hernandez*, since those names are either the names of products that have a specific chemical composition, such as Hydrocodone, or are the names of chemical compounds themselves, such as Diazepam. As a result, we conclude that the visual identification procedure employed by Special Agent Allcox, as explained in his expert testimony, is inconsistent with existing precedent.

Secondly, since existing precedent does not directly address the proper manner in which to identify prescription medications such as those at issue here, we will also examine the nonexclusive "indices of reliability" specified in *Goode* to determine whether the expert's proffered scientific or technical method of proof is sufficiently reliable: "the expert's use of established techniques, the expert's professional background in the field, the use of visual aids before the jury so that the jury is not asked 'to sacrifice its independence by accepting [the] scientific hypotheses on faith,' and independent research conducted by the expert." *Howerton*, 358 N.C. at 460, 597 S.E.2d at 687. Although Special Agent Allcox has an extensive background in the field of drug analysis, we do not believe the record in this case provides an adequate basis for concluding that his visual identification methodology

was sufficiently reliable to support the admission of expert opinion testimony identifying particular items as controlled substances.

As we have already noted, the approach utilized by Special Agent Allcox involved a visual inspection of the tablets and fragments in question and a comparison of the information gained through that process to material contained in a medical reference book. We are not persuaded that, given the record in this case, such an approach is sufficiently reliable, particularly given the fact that, in North Carolina, controlled substances are statutorily defined in terms of their chemical composition. First, the record does not contain any information tending to show that Special Agent Allcox received any sort of specialized training in the use of Micromedics Literature to identify particular medications; in fact, Special Agent Allcox admitted, "I have not received specialized training, specifically, in pharmaceuticals." Secondly, except for Special Agent Allcox's claim to be able to recognize counterfeit controlled substances, the record contains no indication of the degree to which the approach adopted by Special Agent Allcox is a reliable one. Thirdly, although the record does reflect that hospitals and emergency room personnel use the Micromedics Literature to identify medications, the testimony of Special Agent Allcox, taken in context, suggests that this approach has been adopted because of the rapidity with which it can be used to identify medications in emergency situations rather than because it has the degree of reliability required to support expert witness testimony. In addition, Special Agent Allcox did not provide any testimony addressing the reliability of the methodology that he employed. Finally, in light of the reality of counterfeit drugs, *see* 8 Wake Forest Intell. Prop. L.J. 387, 389 (stating that "[t]he World Health Organization estimates that up to 60% of drugs sold in developing countries and up to 20% sold in developed countries are counterfeit"), we are troubled by the significant risk of misidentification that appears to be inherent in the methodology employed by Special Agent Allcox. Thus, given the record in this case, we conclude that the visual identification procedure utilized here does not provide adequate "indices of reliability" sufficient to support the admission of expert testimony.

## 5: Conclusion

As a result, we conclude that the trial court abused its discretion by admitting expert testimony regarding the identification of the following drugs, which Defendant was convicted of possessing with the

STATE v. WARD

[199 N.C. App. 1 (2009)]

intent to sell or deliver: Alprazolam (Xanax), Diazepam (Valium), and Methylphenidate (Ritalin).[18] In light of the importance that testimony identifying particular items as controlled substances necessarily had in those cases, we are constrained to conclude that the trial court's error in those cases prejudiced Defendant's chances for a more favorable outcome at trial. In addition, while the State presented sufficient evidence based on a chemical analysis to support Defendant's convictions for trafficking in opium on 23 August 2006, the same cannot be said for Defendant's convictions for trafficking in opium on 22 August 2006, which rest on the sort of visual identification testimony that we have held to be inadmissible. Once again, given the centrality of the identification issue to the issue of Defendant's guilt of trafficking in opium on 22 August 2006, we conclude that the trial court's error prejudiced Defendant in those cases as well. Finally, the trial court's error clearly prejudiced Defendant's chances for a more favorable outcome at trial with respect to the cases in which he was convicted of maintaining a dwelling and a vehicle for the purpose of keeping and selling controlled substances, each of which involved allegations that Defendant kept and sold controlled substances that were identified solely using the visual identification evidence that we have concluded was erroneously admitted. In each instance, it is not at all clear to us that, except for the erroneous admission of this visual identification evidence, the evidence would have sufficed to support a conviction. As a result, we conclude that Defendant is entitled to a new trial in connection with each of those convictions.

## IV: Conclusion

Thus, for the reasons stated above, we find that the trial court erred by admitting certain testimony relating to items seized in connection with Defendant's 10 February 2005 arrest and by admitting testimony by Special Agent Allcox identifying certain items as controlled substances on the basis of a visual identification process. As a result of the fact that we have left Defendant's convictions for trafficking in opium on 23 August 2006 and possession of cocaine undisturbed, the fact that the trial court consolidated all of Defendant's convictions for judgment, and the fact that the sentence imposed upon Defendant by the trial court was the mandatory sentence for a single count of trafficking in opium in an amount between 14 and 28

---

18. In view of the fact that the trial court arrested judgment in connection with Defendant's conviction for possessing Oxycodone with the intent to sell and deliver, we need not determine whether the admission of Special Agent Allcox's testimony identifying certain items as Oxycodone prejudiced Defendant.

grams, we vacate Defendant's convictions for maintaining a vehicle for the purpose of keeping and selling controlled substances, maintaining a dwelling for keeping and selling controlled substances, possession of Ritalin with the intent to sell and deliver, possession of Xanax with the intent to sell and deliver, possession of Valium with the intent to sell and deliver, and three counts of trafficking in opium arising from events occurring on 22 August 2006; award Defendant a new trial with respect to the issue of his guilt of each of those offenses; and remand this case to the trial court for the correction of the judgment entered against Defendant in light of our decision and the results of any new trial that may be conducted in these cases.

NO ERROR in part; NEW TRIAL in part.

Chief Judge MARTIN and Judge WYNN concur.