STATE OF NORTH CAROLINA v. JIMMY WAYLON WARD

No. 365PA09

(Filed 17 June 2010)

## Drugs; Evidence— pills—sufficiency of visual inspection process—scientifically valid chemical analysis required

The trial court abused its discretion in a drug case by permitting the State's expert witness to identify certain pills as controlled substances when the expert's methodology consisted solely of a visual inspection and comparison with information provided by Micromedex literature and was not sufficiently reliable under N.C.G.S. § 8C-1, Rule 702, and the case is remanded to the Court of Appeals for further remand to the trial court for additional proceedings not inconsistent with this opinion, because: (1) the legislature imposed criminal liability for actions relating to counterfeit controlled substances to acknowledge that their very existence posed a threat to the health and well-being of citizens in our State, and a scientific, chemical analysis must be employed to properly differentiate between the real and the counterfeit; (2) the special agent's explanation for using Micromedex literature focused on concerns for expediency and maximizing limited laboratory resources in light of the relative seriousness of the criminal charges rather than demonstrating its proven reliability; (3) jurors may ascribe so much authority to a noteworthy expert in forensic chemistry that they treat his testimony as infallible and automatically accept his opinion on the chemical composition of a substance without properly appreciating, even with vigorous cross-examination and proper jury instructions, that the expert chemist never performed a scientific, chemical analysis; (4) the length of time a method has been employed does not necessarily heighten its reliability; (5) it cannot be concluded that the deficiencies of the special agent's visual identification process only affected the amount of weight the jury assigned to his testimony since the method of proof at issue was not sufficiently reliable for criminal prosecutions; and (6) the burden is on the State to establish the identity of any alleged controlled substance that is the basis of the prosecution, and some form of scientifically valid chemical analysis is required unless the State establishes before the trial court that another method of identification is sufficient to establish the identity of the controlled substance beyond a reasonable doubt.

**STATE v. WARD**

[364 N.C. 133 (2010)]

Justice TIMMONS-GOODSON concurrs in the result only.

Justice NEWBY dissenting.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 199 N.C. App. ——, 681 S.E.2d 354 (2009), finding error in part in a judgment entered 14 January 2008 by Judge Charles H. Henry in Superior Court, New Hanover County, and remanding for a new trial. Heard in the Supreme Court 15 February 2010.

*Roy Cooper, Attorney General, by Amy Kunstling Irene, Assistant Attorney General, for the State-appellant.*

*Paul F. Herzog for defendant-appellee.*

*Anne Bleyman, and Rudolf Widenhouse & Fialko, by M. Gordon Widenhouse, Jr., Counsel for North Carolina Advocates for Justice, amicus curiae.*

BRADY, Justice.

In the case *sub judice* the State presented expert witness testimony at trial to the effect that pills found on Defendant Jimmy Waylon Ward's person, in his vehicle, and at his residence were pharmaceuticals classified as controlled substances under the North Carolina Controlled Substances Act. N.C.G.S. ch. 90, art. 5 (2009). The issue for our review is whether the trial court abused its discretion by permitting the State's expert witness to identify certain pills when the expert's methodology consisted solely of a visual inspection process. Under the facts of this case, the testifying expert's visual identification of the purported controlled substances is not sufficiently reliable under N.C.G.S. § 8C-1, Rule 702. Accordingly, the trial court abused its discretion, and we affirm the Court of Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

In relevant part, the State's evidence at trial tended to show that Mandy Pope visited the New Hanover County Sheriff's Office, Vice and Narcotics Division, on 22 August 2006 seeking to assist law enforcement in an investigation of the individual who allegedly supplied her mother with illicit pharmaceuticals on a regular basis. Pope telephoned defendant from the Sheriff's Office and arranged to meet him at the Carolina Beach Exxon station for the purpose of purchasing thirty Lorcet pills for six dollars per pill. Lorcet is an opium deriva-

**STATE v. WARD**

[364 N.C. 133 (2010)]

tive, a Schedule III controlled substance. After law enforcement placed a transmitter device in her purse and gave her three hundred dollars in United States currency, Pope traveled with Detective Nancy Willaford in an undercover minivan to the designated Exxon station, arriving shortly after 8:00 p.m. Several other undercover law enforcement officers conducted surveillance and provided security and back-up support. Defendant arrived five to ten minutes later and parked his black Chevrolet Monte Carlo next to the minivan. Pope then exited the minivan and entered defendant's vehicle. Detective Willaford remained in the minivan. Pope and defendant conversed in his vehicle, and then both exited when defendant retrieved something from the trunk of his vehicle. Pope and defendant then returned to defendant's vehicle, and Pope purchased from defendant thirty blue, oval-shaped pills, which Pope believed to be Lorcets, for one hundred eighty dollars in United States currency. Pope then exited defendant's vehicle, entered the minivan, and traveled back to the Sheriff's Office with Detective Willaford. Defendant left the Exxon station in his vehicle, and several law enforcement officers continued their surveillance by following him to his residence. Pope returned the remaining money and delivered the pills she purchased from defendant to law enforcement.

Based on the officers' surveillance and the events at the Carolina Beach Exxon station, warrants were obtained the next day, 23 August 2006, to arrest defendant and search his residence. After observing a black Monte Carlo leave the mobile home park where defendant resided, law enforcement officers stopped the vehicle and confirmed that defendant was the operator. Defendant was arrested and his person and vehicle were searched incident to the arrest. Law enforcement recovered three pill bottles and six hundred twenty dollars in United States currency from defendant. One bottle contained blue tablets and had a label attached indicating thirty tablets of Hydrocodone in the name of Jimmy W. Ward. A second medicine bottle with an illegible affixed label contained white tablets. The third bottle contained three different kinds of pills and had a label attached indicating sixty tablets of generic Xanax in the name of defendant's cousin, Manuel Ward. Law enforcement officers also searched the trunk of defendant's vehicle and discovered several more bottles of pills and a bank envelope containing blue pills. A prescription bottle and an additional nine hundred five dollars were retrieved from under the trunk's carpeting. Law enforcement officers then searched defendant's residence and storage shed and another vehicle at the premises. From this search, officers seized a number of items, includ-

ing a digital scale, a silver metal pipe fashioned as a smoking device, a substance resembling off-white rocks, a bottle containing ninety-three tablets with an affixed label indicating Hydrocodone for Manuel Ward, and a plastic drinking cup containing full and half pill tablets.

On 25 September 2006, the New Hanover County Grand Jury returned six true bills of indictment charging defendant with numerous crimes related to his activities on 22 and 23 August 2006 and the resulting searches previously described. At trial Special Agent Irvin Lee Allcox, a chemist in the Drug Chemistry Section of the State Bureau of Investigation (SBI) crime laboratory, was qualified and testified as an expert in chemical analysis of drugs and forensic chemistry. He testified to working over thirty-four years for the SBI, including the most recent twenty-four years as a chemist in the SBI crime laboratory. He stated he had previously testified as an expert in forensic chemistry over five hundred times in state and federal courts. Among the items the SBI laboratory received for examination from the New Hanover County Sheriff's Office pertaining to this case, Special Agent Allcox identified the following controlled substances: Dihydrocodeinone, Hydrocodone, and Oxycodone, which are opium derivatives, and cocaine, Amphetamine, Alprazolam (Xanax), Diazepam (Valium), and Methylphenidate (Ritalin). He also identified Carisoprodol (Soma), which is not a controlled substance.

In response to questions concerning the identification process, Special Agent Allcox testified that of the sixteen collections of items submitted, he conducted a chemical analysis on "about half of them." The remaining tablets were identified solely by visual inspection and comparison with information provided by Micromedex[1] literature, which Special Agent Allcox described as a "medical publication that is used by the doctors in hospitals and pharmacies to identify prescription medicine." According to Special Agent Allcox, the SBI has used Micromedex in some capacity throughout the nearly thirty-five years he has been associated with the agency. He testified that through "a listing of all the pharmaceutical markings," Microme-

1. The transcript of Special Agent Allcox's testimony reflects the spelling, "Micromedics," and the Court of Appeals presumably adopted that spelling based on the transcript. *See State v. Ward,* —— N.C. App. ——, ——, 681 S.E.2d 354, 369, 372-73 (2009). However, both parties agree before this Court that "Micromedex" is the correct name. *See, e.g., Wright v. Abbott Labs.,* 62 F. Supp. 2d 1186, 1195 (D. Kan. 1999) (referencing "the Micromedex drug information program"), *aff'd,* 259 F.3d 1226 (10th Cir. 2001); *Schroeder v. Nw. Cmty. Hosp.,* 371 Ill. App. 3d 584, 588, 862 N.E.2d 1011, 1015-16 (2006) (same), *appeal denied,* 224 Ill. 2d 593, 871 N.E.2d 61 (2007); http://www.micromedex.com. Accordingly, we will adopt the spelling "Micromedex" to refer to the literature utilized by Special Agent Allcox.

dex can help "identify the contents, the manufacturer and the type of substances in the tablets." He believed that counterfeit tablets were obvious to distinguish because they lacked the uniform color, shape, and markings associated with the high standards of the pharmaceutical industry. In his opinion, no tablets seized in this case were counterfeit.

When asked why he performed only a visual inspection with Micromedex literature on some of the tablets and a chemical analysis on others, Special Agent Allcox focused his response on concerns for maximizing time and resources: "[W]e have limited resources and we have to weed out—we have to analyze the most important items. . . . [W]e don't have the resources to analyze everything that's submitted." He also indicated that SBI standard operating procedures determined which substances received which type of analysis depending on the information provided to the laboratory by the law enforcement officer submitting the evidence. Physical evidence submitted to the SBI laboratory for analysis must be accompanied by Form SBI-5, "Request for Examination of Physical Evidence." Crime Lab Div., N.C. State Bureau of Investigation, *Evidence Guide* 11, 13-15, 20 (Jan. 1, 2010), *available at* http://www.ncdoj.gov/About-DOJ/State-Bureau-of-Investigation/Crim e-Lab/NCSBI-Evidence-Guide.aspx. In Part B of Form SBI-5, the requesting officer is asked to give a "[d]escription of the incident (Brief Summary of the events of the crime)" or to attach a copy of the investigative report. *Id.* at 15.

Special Agent Allcox described the significance of the requesting officer's description of the incident under investigation in terms of which type of analysis he performed. For instance, one collection of thirty pills in this case was not chemically analyzed because, based on the submission sheet given to the laboratory, the number of tablets submitted could potentially support only a misdemeanor charge of possession of a controlled substance. Under standard operating procedures, substances supporting only misdemeanor charges were routinely identified solely by visual inspection with comparison to the Micromedex literature. However, substances that were submitted to the laboratory under circumstances that would support felony charges received "a *complete* analysis" pursuant to laboratory procedures. (Emphasis added.) Defense counsel was quick to highlight on cross-examination that the collection of thirty pills at issue was ultimately used to bring a felony trafficking charge and not a misdemeanor possession charge. In response, Special Agent Allcox testified: "If the officer had indicated that it was an undercover buy case

when submitting these 30 tablets, then I would have done a *complete analysis*." (Emphasis added.)

The trial court admitted Special Agent Allcox's testimony regarding the substances on which he conducted a chemical analysis;[2] furthermore, over defendant's objections, the trial court also admitted Special Agent Allcox's testimony regarding substances which he identified merely by visual inspection and reference to the Micromedex literature.[3]

Defendant offered evidence and testified to the effect that most of the seized items were his legitimate prescription medications or they belonged either to his cousin Manuel Ward or to a girlfriend. He denied selling controlled substances to Mandy Pope on 22 August 2006, and he explained that he acquired the large sums of currency through buying and selling automobiles, a business he operated with his cousin Manuel Ward.

The jury returned guilty verdicts against defendant for six counts of trafficking in opium (three counts from his activities on 22 August

2. Special Agent Allcox conducted a chemical analysis of the following substances: (1) State's Exhibit 26-A-1, determined to be crack cocaine, a Schedule II controlled substance, with a weight of 3.0 grams; (2) State's Exhibit 26-A-3, consisting of 94 green tablets, determined to contain Dihydrocodeinone (Hydrocodone), a Schedule III preparation, with a weight of 76.8 grams; (3) State's Exhibit 26-B-1, consisting of 18½ blue tablets, determined to contain Dihydrocodeinone (Hydrocodone), a Schedule III preparation, with a weight of 15.7 grams; (4) State's Exhibit 26-B-4, consisting of 66 blue tablets, determined to contain Dihydrocodeinone (Hydrocodone), a Schedule III preparation, with a weight of 55.36 grams; (5) State's Exhibit 26-B-6, consisting in part of 13 orange tablets, determined to contain Amphetamine (Adderall), a Schedule II preparation, with a weight of 4.7 grams; (6) State's Exhibit 26-B-7, consisting of 19 white tablets, determined to contain Hydrocodone/Dihydrocodeinone, a Schedule III preparation, with a weight of 12.24 grams; and (7) State's Exhibit 26-B-12, consisting of 13 white tablets and determined to contain Dihydrocodeinone (Hydrocodone), a Schedule III preparation, with a weight of 9.5 grams.

3. Identification by visual inspection alone was made as to the following: (1) State's Exhibit 3-A, consisting of 30 blue tablets, determined to contain Dihydrocodeinone (Hydrocodone), a Schedule III controlled substance, with a total weight of 24 grams; (2) State's Exhibit 26-A-4, consisting of 3 blue tablets and fragments, identified as containing Amphetamine (Adderall), a Schedule II controlled substance; (3) State's Exhibit 26-B-3, consisting of (a) 83½ small, blue, oval tablets, identified as containing Alprazolam (Xanax), a Schedule IV controlled substance, (b) 14 round, blue tablets, identified as containing Diazepam (Valium), a Schedule IV controlled substance, and (c) 15½ orange tablets, identified as containing Methylphenidate (Ritalin), a Schedule II controlled substance; (4) State's Exhibit 26-B-5, containing 23 white tablets, identified as Oxycodone, a Schedule II controlled substance; (5) State's Exhibit 26-B-6, containing 5 white tablets, identified as Methylphenidate (Ritalin), a Schedule II controlled substance; and (6) State's Exhibit 26-B-9, containing 13 blue tablets, identified as Oxycodone, a Schedule II controlled substance.

2006 and three counts arising from his arrest and the searches conducted on 23 August 2006), and single counts of intentionally maintaining a dwelling for keeping or selling controlled substances, possession of cocaine, intentionally maintaining a vehicle for keeping or selling controlled substances, possession of Ritalin with the intent to sell or deliver, possession of Xanax with the intent to sell or deliver, possession of Valium with the intent to sell or deliver, possession of Oxycodone with the intent to sell or deliver, and possession of drug paraphernalia. The trial court arrested the jury's guilty verdict in connection with the conviction for possessing Oxycodone with the intent to sell or deliver. All charges were consolidated for judgment, and defendant was sentenced to an active term of 90 to 117 months of imprisonment and a $100,000 fine pursuant to the guidelines established in N.C.G.S. § 90-95(h)(4)(b). Defendant then gave notice of appeal.

On appeal defendant challenged the trial court's admission of prior bad acts evidence in connection with an arrest on 10 February 2005, as well as Special Agent Allcox's testimony identifying certain items as controlled substances based solely on a visual inspection process. The Court of Appeals issued a unanimous opinion on 18 August 2009 finding no error in part and ordering a new trial in part. *State v. Ward*, —— N.C. App. ——, ——, 681 S.E.2d 354, 373-74 (2009). Defendant's convictions for trafficking in opium on 23 August 2006 and for possession of cocaine were left undisturbed; however, the Court of Appeals vacated defendant's other convictions and ordered a new trial as to those offenses. *Id.* We allowed the State's motion for temporary stay on 4 September 2009. On 8 October 2009, this Court allowed the State's petitions for writ of supersedeas and for discretionary review to address whether the trial court abused its discretion by permitting Special Agent Allcox to give expert opinion testimony identifying certain pills based solely on a visual inspection methodology.

## ANALYSIS

When reviewing the ruling of a trial court concerning the admissibility of expert opinion testimony, the standard of review for an appellate court is whether the trial court committed an abuse of discretion. *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (citations omitted). An " '[a]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Elliott*, 360 N.C. 400, 419, 628 S.E.2d 735, 748 (quoting

*State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)), *cert. denied*, 549 U.S. 1000 (2006).

Under the North Carolina Rules of Evidence, when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." N.C.G.S. § 8C-1, Rule 702(a) (2009). Under Rule of Evidence 702, this Court has established three steps "for evaluating the admissibility of expert testimony: (1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?" *Howerton*, 358 N.C. at 458, 597 S.E.2d at 686 (citing *State v. Goode*, 341 N.C. 513, 527-29, 461 S.E.2d 631, 639-41 (1995)). The proponent of the expert witness, in this case the State, has "the burden of tendering the qualifications of the expert" and demonstrating the propriety of the testimony under this three-step approach. *See Crocker v. Roethling*, 363 N.C. 140, 144, 675 S.E.2d 625, 629 (2009). The parties view this case as implicating only the first step of the evaluation, so we will only address whether the method of proof was sufficiently reliable as an area for expert testimony.

Determining the reliability of a method of proof is "a preliminary, foundational inquiry into the basic methodological adequacy of an area of expert testimony." *Howerton*, 358 N.C. at 460, 597 S.E.2d at 687. In order to

determine whether an expert's area of testimony is considered sufficiently reliable, "a court may look to testimony by an expert specifically relating to the reliability, may take judicial notice, or may use a combination of the two." Initially, the trial court should look to precedent for guidance in determining whether the theoretical or technical methodology underlying an expert's opinion is reliable.

*Id.* at 459, 597 S.E.2d at 687 (quoting *Goode*, 341 N.C. at 530, 461 S.E.2d at 641). In the event that precedent does not guide the determination, or if a trial court is "faced with novel scientific theories, unestablished techniques, or compelling new perspectives on otherwise settled theories or techniques," then "nonexclusive 'indices of reliability' " may be used to answer the question of reliability. *Id.* at 460, 597 S.E.2d at 687 (citations omitted). Several recognized indices

of reliability are "the expert's use of established techniques, the expert's professional background in the field, the use of visual aids before the jury so that the jury is not asked to sacrifice its independence by accepting [the] scientific hypotheses on faith, and independent research conducted by the expert." *Id.* (alteration in original) (citations and internal quotation marks omitted).

Recently, the field of forensic science has come under acute scrutiny on a nationwide basis. When articulating the right of a criminal defendant under the Sixth Amendment of the United States Constitution to confront forensic analysts as witnesses at trial, the Supreme Court of the United States in *Melendez-Diaz v. Massachusetts* was quick to recognize the significance of a landmark report issued in 2009 by the National Academy of Sciences. —— U.S. ——, ——, 129 S. Ct. 2527, 2536 (2009) (citing Comm. on Identifying the Needs of the Forensic Scis. Cmty., Nat'l Research Council, *Strengthening Forensic Science in the United States: A Path Forward* (2009) [hereinafter National Academy Report], *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf *and* http://books.nap.edu/openbook.php?record_id=12589&page=R1). Relying on the National Academy Report in part, the Court commented that "[f]orensic evidence is not uniquely immune from the risk of manipulation," *id.* at ——, 129 S. Ct. at 2536, and "[s]erious deficiencies have been found in the forensic evidence used in criminal trials," *id.* at ——, 129 S. Ct. at 2537. The funding for the National Academy Report came from Congress in 2005 when it provided $1.5 million. H.R. Rep. No. 109-272, at 121 (2005) (Conf. Rep.). As a result, a diverse committee of forensic experts, scientists, and members of the legal community, conducted several years of research and concluded that the pervasive sentiment was that "[t]he forensic science system, encompassing both research and practice, has serious problems that can only be addressed by a national commitment to overhaul the current structure that supports the forensic science community in this country." National Academy Report Preface, at xx (Emphasis omitted). Among its many findings, the committee noted that forensic scientists "sometimes face pressure to sacrifice appropriate methodology for the sake of expediency." *Id.* Summary, at 24. The committee further found that "[t]here are many hard-working and conscientious people in the forensic science community, but [] under-resourcing inherently limits their ability to do their best work." *Id.* at 15.

In the case *sub judice* our determination is guided in part by precedent, enactments of the General Assembly, and Special Agent Allcox's own testimony. We conclude that the visual inspection methodology Special Agent Allcox proffered as an area for expert testimony is not sufficiently reliable to identify the substances at issue.

In *State v. Llamas-Hernandez* a jury found the defendant guilty of trafficking in cocaine after hearing lay witness testimony from two law enforcement detectives who seized "a white powdery substance weighing approximately 55 grams" at a residence where the defendant was a co-tenant. 189 N.C. App. 640, 643, 659 S.E.2d 79, 81 (2008), *rev'd per curiam*, 363 N.C. 8, 673 S.E.2d 658 (2009). The substance was chemically analyzed nine months before trial, but the laboratory report was not admitted into evidence as a sanction against the State for discovery violations. *Id.* at 651, 659 S.E.2d at 86 (Steelman, J., concurring in part and dissenting in part). The trial court allowed the detectives to testify as lay witnesses that the substance was powder cocaine based on their law enforcement experience and training in identifying controlled substances. *Id.* at 643, 647, 659 S.E.2d at 81, 83 (majority).

Subsequently, this Court reversed the Court of Appeals majority decision for "the reasons stated in the dissenting opinion." *Llamas-Hernandez*, 363 N.C. at 8, 673 S.E.2d at 658. The dissenting judge concluded that by providing "procedures for the admissibility of [] laboratory reports" and "enacting such a technical, scientific definition of cocaine, it is clear that the General Assembly intended that expert testimony be required to establish that a substance is in fact a controlled substance." *Llamas-Hernandez*, 189 N.C. App. at 652, 659 S.E.2d at 86-87 (Steelman, J., concurring in part and dissenting in part) (citing N.C.G.S. § 90-90(1)(d) (2007) (defining cocaine) and *id.* §§ 8-58.20, 90-95(g), (g1) (2007) (establishing procedures for admitting laboratory reports)). The dissent argued that "if it was intended by the General Assembly that an officer could make a visual identification of a controlled substance, then such provisions in the statutes would be unnecessary." *Id.* at 653, 659 S.E.2d at 87. The natural next step following our decision to adopt the reasoning of the dissenting judge in *Llamas- Hernandez* is to conclude here that the expert witness testimony required to establish that the substances introduced here are in fact controlled substances must be based on a scientifically valid chemical analysis and not mere visual inspection.[4]

4. Although not binding on this Court, we also note that courts in other jurisdictions have reached similar conclusions. In an analogous case from Illinois, an appellate

Next, as in *Llamas-Hernandez,* we find acts of the General Assembly relevant to our decision. First and foremost is the obvious point that throughout the lists of Schedule I through VI controlled substances found in sections 90-89 through 90-94, care is taken to provide very technical and "specific chemical designation[s]" for the materials referenced therein. *E.g.,* N.C.G.S. §§ 90-89(1) (opiates), -90(2) (opiates), -91(j) (stimulants), -92(a)(1) (depressants). These scientific definitions imply the necessity of performing a chemical analysis to accurately identify controlled substances before the criminal penalties in N.C.G.S. § 90-95 are imposed.

Furthermore, the legislature has made it unlawful not only to "manufacture, sell or deliver, or possess with intent to manufacture, sell or deliver, a controlled substance," *id.* § 90-95(a)(1), but it is also illegal to "create, sell or deliver, or possess with intent to sell or deliver, a *counterfeit* controlled substance," *id.* § 90-95(a)(2) (emphasis added). The statutory definition of "[c]ounterfeit controlled substance," *id.* § 90-87(6), designates three factors that collectively indicate evidence of an intent to misrepresent a controlled substance. One of the factors is that the "physical appearance of the tablets, capsules or other finished product containing the substance is substantially identical to a specified controlled substance." *Id.* § 90-87(6)(b)(3). Clearly, the General Assembly contemplated that anyone manufacturing a counterfeit substance would make it look as close to the genuine product as possible. By imposing criminal liability for actions related to counterfeit controlled substances, the legislature not only acknowledged that their very existence poses a threat to the health and well-being of citizens in our state, but that a scientific, chemical analysis must be employed to properly differentiate between the real and the counterfeit. Even a different felony class

court held that expert witness testimony identifying tablets as containing controlled substances based on comparing them "to pictures in a book" amounted to "conjecture" and "speculat[ion]" and was not a "conclusive scientific analysis" on which the prosecution could rely to carry its burden of proof. *People v. Mocaby,* 378 Ill. App. 3d 1095, 1100, 882 N.E.2d 1162, 1167 (2008); *see also State v. Colquitt,* 133 Wash. App. 789, 794, 137 P.3d 892, 894 (2006) (overturning a conviction when the prosecutor offered as evidence that a law enforcement officer believed the substance at issue was cocaine and conducted a field test that was never verified by further laboratory testing).

The State cites decisions from other jurisdictions that appear to allow the type of visual inspection process at issue for identifying controlled substances. *See State v. Carter,* 07-1237, p. 14-16 (La. App. 3 Cir. 4/9/08); 981 So. 2d 734, 744-45; *State v. Clark,* 2008 MT 419, ¶¶ 40-43, 347 Mont. 354, ¶¶ 40-43, 198 P.3d 809, ¶¶ 40-43 (2008); *State v. Stank,* 2005 WI App. 236, ¶¶ 40-44, 288 Wis. 2d 664, ¶¶ 40-44, 708 N.W.2d 43, ¶¶ 40-44, *rev. dismissed,* 2006 WI 3, 286 Wis. 2d 664, 708 N.W.2d 695 (2005). To the extent these cases support the State's argument, we find them unpersuasive to our holding.

level is assigned for sentencing purposes based on whether a particular item is a genuine or fake controlled substance. *Compare id.* § 90-95(b) (assigning various felony levels to criminal activity relating to controlled substances, including Classes C, G, H, and I) *with id.* § 90-95(c) (stating that "[a]ny person who violates G.S. 90-95(a)(2) [the *counterfeit* controlled substance provision] shall be punished as a Class I felon"). As such, a scientifically valid chemical analysis of alleged controlled substances is critical to properly enforcing the North Carolina Controlled Substances Act.

In addition to the guidance we receive from precedent and enactments of the General Assembly, we may also " 'look to testimony by an expert specifically relating to the reliability' " of the method of proof. *Howerton*, 358 N.C. at 459, 597 S.E.2d at 687 (quoting *Goode*, 341 N.C. at 530, 461 S.E.2d at 641). Here, Special Agent Allcox's testimony is lacking in sufficient credible indicators to support the reliability of his visual inspection methodology. There is little evidence in the record either implying that identification of controlled substances by mere visual inspection is scientifically reliable or suggesting that Special Agent Allcox's particular methodology was uniquely reliable. His testimony is completely devoid of any scientific data or demonstration of the reliability of his methodology. Moreover, in stating, "I have not seen counterfeit pharmaceuticals that you cannot look at and see that they were counterfeit," and "I have seen very few pharmaceutical counterfeits over the years," Special Agent Allcox did not provide positive proof for the reliability of his methodology, especially when "the *rising occurrence* of potentially unsafe counterfeit drugs" is considered. U.S. Food & Drug Admin., *FDA Initiative to Combat Counterfeit Drugs*, http://www.fda.gov/Drugs/DrugSafety/ucm180899.htm (last visited June 4, 2010) (emphasis added); *see also Pharmaceutical Supply Chain Security: Hearing Before the H. Subcomm. on Criminal Justice, Drug Policy, and Human Resources of the Comm. on Government Reform*, 109th Cong. 24 (2006) (" 'Counterfeit prescription drugs . . . pose a serious threat to the public health. *Many are visually indistinguishable from authentic drugs.*' " (emphasis added) (quoting U.S. Food & Drug Admin., *FDA Counterfeit Drug Task Force Report: 2006 Update*, at 1, *available at* http://www.fda.gov/Drugs/DrugSafety/ucm172773.htm)); Robert C. Bird, *Counterfeit Drugs: A Global Consumer Perspective*, 8 Wake Forest Intell. Prop. L.J. 387, 387, 389 (2008) ("The proliferation of counterfeit medicines is one of the most pressing issues facing the pharmaceutical industry. . . . The World

Health Organization estimates that . . . up to 20% [of drugs] sold in developed countries are counterfeit." (citations omitted)).

Rather than demonstrating its proven reliability, Special Agent Allcox's explanation for using Micromedex literature focused on concerns for expediency and maximizing limited laboratory resources in light of the relative seriousness of the criminal charges. The SBI's own website states that "chemists perform the chemical analysis of evidence from criminal investigations, such as drugs," and "chemists utilize state-of-the-art instrumentation systems to analyze evidence." N.C. Dep't of Justice, State Bureau of Investigation, Drug Chemistry & Toxicology, http://www.ncdoj.gov/About-DOJ/State-Bureau-of-Investigation/Crim e-Lab/Drug-Chemistry-and-Toxicology.aspx (last visited June 4, 2010). Apparently, however, this is not invariably the case. On cross-examination Special Agent Allcox explained: "And the procedure[] in the crime laboratory is that misdemeanor pharmaceutical cases, if it's misdemeanor amounts, less than a felony amount, then we do an identification using the Micromedics [sic] files and cases involving felony amounts, *then we do a complete analysis.*" (Emphasis added.) It is difficult to view this testimony as reflecting anything other than a technique for "cutting corners." Thus, even Special Agent Allcox's own testimony casts an unsettling shadow of doubt on the reliability of mere visual inspection as a method of proof.

In arguing for the reliability of a visual inspection methodology, the State emphasizes Special Agent Allcox's professional experience and contends that "Micromedex is a well-established method that has been used by the crime lab for 35 years and is also used by doctors and pharmacists." The State submits that any shortcomings inherent to the visual identification process should be measured by the jury only when considering the weight of the evidence. We disagree.

Special Agent Allcox's credentials are not disputed; he appears to be eminently qualified as an expert witness in forensic chemistry. He has worked over thirty-four years with the SBI, including twenty-four years as a forensic chemist, and he handles pharmaceuticals on nearly a daily basis. The prosecutor at trial referred to him as "supremely qualified." However, the issue here concerns the reliability of his method of proof, which is a "preliminary, foundational inquiry." *Howerton*, 358 N.C. at 460, 597 S.E.2d at 687. "Once the trial court has determined that the method of proof is sufficiently reliable as an area for expert testimony, *the next level of inquiry* is whether

the witness testifying at trial is qualified as an expert to apply this method to the specific facts of the case." *Goode*, 341 N.C. at 529, 461 S.E.2d at 640 (emphasis added) (citing N.C. R. Evid. 702).[5]

Special Agent Allcox's remarkable credentials as a forensic chemist presents a particularly compelling need to halt his testimony when it is based on an insufficient method of proof. In *State v. Grier* this Court held that polygraph evidence is inadmissible at trial because of the inherent unreliability of polygraph tests. 307 N.C. 628, 642-45, 300 S.E.2d 351, 359-61 (1983). As well, this Court was "disturbed by the possibility that the jury may be unduly persuaded" by the testimony of the polygraph examiner, which would likely " 'be shrouded with an aura of near infallibility.' " *Id.* at 643, 300 S.E.2d at 360 (quoting *United States v. Alexander*, 526 F.2d 161, 168 (8th Cir. 1975)). This Court further noted that " '[t]o the extent that the polygraph results are accepted as unimpeachable or conclusive by jurors, despite cautionary instructions by the trial judge, the jurors' traditional responsibility to collectively ascertain the facts and adjudge guilt or innocence is preempted.' " *Id.* at 644, 300 S.E.2d at 360 (quoting *Alexander*, 526 F.2d at 168). The concern in the present context is that jurors may ascribe so much authority to such a noteworthy expert in forensic chemistry that they treat his testimony as infallible and automatically accept his opinion on the chemical composition of a substance, without properly appreciating—even with vigorous cross-examination and proper jury instructions—that the expert chemist never even performed a scientific, chemical analysis.

Additionally, the length of time a method has been employed does not necessarily heighten its reliability or alleviate our concerns. The SBI's practice has been illuminated here due in part to the Supreme Court of the United States decision in *Melendez-Diaz v. Massachusetts*, in which the Court indicated that the Confrontation Clause of the Sixth Amendment to the United States Constitution

---

5. We note that although Special Agent Allcox's background is impressive in the field of analytical chemistry, he stated that he lacks a pharmaceutical degree or specialized training in pharmaceuticals. He testified that he holds a bachelor of science degree with a major in chemistry from North Carolina State University. While not the primary issue before us, we take this opportunity to note that "[c]aution should be exercised in assuring that the subject matter of the expert witness's testimony relates to the expertise the witness brings to the courtroom." Walker Jameson Blakey et al., *North Carolina Evidence: 2010 Courtroom Manual* 241 (2010). Beyond his routine use of Micromedex literature to visually identify substances, there is little indication in the record that Special Agent Allcox was better qualified to visually identify a tablet than the average juror with ordinary perceptive abilities who, if called upon, could compare a tablet to a photograph and other descriptive literature.

applies to forensic analysts generating laboratory reports in criminal investigations because the reports are testimonial in nature. —— U.S. at ——, 129 S. Ct. at 2531-32; *see also State v. Locklear*, 363 N.C. 438, 452, 681 S.E.2d 293, 304-05 (2009) (applying *Melendez-Diaz* to a forensic analyst's autopsy report). Forensic chemists are being called upon to testify as expert witnesses so that defendants have an opportunity for cross-examination. The practical effect of the *Melendez-Diaz* ruling is that through cross-examination more light is being shed on the procedures expert witnesses use to support their testimony. In some instances, when practices are illuminated "in the crucible of cross-examination," their shortcomings become apparent. *See Crawford v. Washington*, 541 U.S. 36, 61 (2004). In this way, the Confrontation Clause gradually advances its "ultimate goal," which is to "ensure reliability of evidence." *Id.*

Furthermore, the State notes that doctors and pharmacists utilize Micromedex literature in the health care industry. However, if health care professionals make mistakes there are established legal avenues of recourse for damages. The consequences at stake in a criminal prosecution make the present situation somewhat different. The reliability of an expert witness's method of proof should be addressed before a defendant is found guilty, stripped of his liberty, and serves a sentence of incarceration.

Because the method of proof at issue is not sufficiently reliable for criminal prosecutions, we cannot conclude, as the State argues, that the deficiencies of Special Agent Allcox's visual identification process only affect the amount of weight the jury assigns to his testimony. Adopting that view would circumvent the fundamental issue at stake, that is, the reliability of the evidence, and would risk a greater number of false positive identifications.

We acknowledge that controlled substances come in many forms and that we are unable to foresee every possible scenario that may arise during a criminal prosecution. Nevertheless, the burden is on the State to establish the identity of any alleged controlled substance that is the basis of the prosecution. Unless the State establishes before the trial court that another method of identification is sufficient to establish the identity of the controlled substance beyond a reasonable doubt, some form of scientifically valid chemical analysis is required. This holding is limited to North Carolina Rule of Evidence 702. Our ruling does not affect visual identification techniques employed by law enforcement for other purposes, such as

conducting criminal investigations. Moreover, common sense limits this holding regarding the scope of the chemical analysis that must be performed. The State submitted sixteen batches of items consisting of over four hundred tablets to the SBI laboratory in this case. A chemical analysis of each individual tablet is not necessary. The SBI maintains standard operating procedures for chemically analyzing batches of evidence, and the propriety of those procedures is not at issue here. A chemical analysis is required in this context, but its scope may be dictated by whatever sample is sufficient to make a reliable determination of the chemical composition of the batch of evidence under consideration. As this Court stated in *Howerton*, expert testimony need not be "indisputably valid before it can be admitted into evidence." 358 N.C. at 460, 597 S.E.2d at 687.

The aim is that the analysis be objective. SBI chemists are in a unique position. The SBI is "a division of the Department of Justice," and Special Agent Allcox is a sworn law enforcement officer who "work[s] closely with local police and Sheriffs, [and] district attorneys." N.C. Dep't of Justice, State Bureau of Investigation, http://www.ncdoj.gov/about-DOJ/state-bureau-of-investigation.aspx (last visited June 4, 2010). Yet, subjectivity that may unwittingly lead to law enforcement bias is a peril that should be guarded against in the field of forensic science. In the end, our holding today will, we think, promote not merely convictions of those who have violated the Controlled Substances Act, but will help ensure true justice. Ultimately, the State is better served by identifying perpetrators with reliable evidence and reducing the likelihood that convictions rest on inaccurate data.

For the foregoing reasons we conclude that, as the proponent of Special Agent Allcox's expert witness testimony, the State has not carried its burden of demonstrating the sufficient reliability of his visual inspection methodology. Therefore, the trial court abused its discretion by permitting Special Agent Allcox to identify certain evidence as controlled substances based merely on visual inspection as a method of proof. We affirm the Court of Appeals as to the issue before us and remand to that court for further remand to the trial court for additional proceedings not inconsistent with this opinion.

AFFIRMED AND REMANDED.

Justice TIMMONS-GOODSON concurrs in the result only.

**STATE v. WARD**

[364 N.C. 133 (2010)]

Justice NEWBY dissenting.

In this case the trial court properly exercised its discretion to admit an expert's testimony that, based on a visual examination and comparison with a medical publication, pills seized from defendant contained controlled substances. However, the majority concludes that the expert's method of visually identifying controlled substances is unreliable and that the trial court's decision to the contrary was an abuse of discretion. The majority's approach alters the law of this state as it pertains to the admission of expert opinion testimony. Accordingly, I respectfully dissent.

Special Agent Allcox of the State Bureau of Investigation ("SA Allcox") is an expert in forensic chemistry and drug analysis. He has two degrees in science, including a chemistry degree from North Carolina State University. The courses of study leading to these degrees included instruction in quantitative analysis of physical chemistry, general chemistry, organic chemistry, and qualitative analysis. In addition to his formal scientific education, SA Allcox has investigated and analyzed drugs in a professional capacity for over thirty-four years. Using this considerable education and experience, SA Allcox identified the pills seized in this case and determined that the majority of those pills contained controlled substances.

SA Allcox used a two step visual identification method to determine the composition of some of the pills seized from defendant. First, utilizing his education, training, and experience, SA Allcox examined the item and made notes of its pharmaceutical markings, its appearance, its color, its size, and its shape, and compared his findings to "a listing of all the pharmaceutical markings [used] to identify" a pill in the Micromedex publication. Second, after identifying the pill, SA Allcox determined its chemical composition from the Micromedex publication.

SA Allcox explained that the SBI laboratory normally uses this visual identification method to analyze pills in misdemeanor cases. It does so because the laboratory does not have the resources to conduct a chemical analysis of every item submitted. The SBI laboratory uses chemical analyses in its other cases to ensure that more of its resources are devoted to the more serious offenses, such as those involving cocaine and opium derivatives. SA Allcox explained that despite the lack of chemical analysis the method of visually identifying pills is reliable and proven.

SA Allcox testified that the medical industry believes that visual identification is a reliable method of determining a pill's chemical composition. He stated that "doctors in hospitals and pharmacies" rely on Micromedex "to identify prescription medicine." SA Allcox also explained that pharmacists dispense pills "based upon the markings that are on the drug" and that to identify those pills, pharmacists use the same Micromedex database that is used by the SBI laboratory. The clear implication from this testimony is that medical professionals believe this visual identification method is sufficiently reliable to stake their professional licenses, reputations, and patients' well-being on the accuracy and reliability of its results.

Furthermore, SA Allcox indicated that the SBI itself believes this method is reliable. SA Allcox stated that the SBI laboratory has used Micromedex "for the 35 years that [he has] been associated with the crime laboratory" and trusts the accuracy of the results achieved using it. His testimony further demonstrates this belief. After visually examining the pills in State's Exhibit 26-B-2, SA Allcox determined from Micromedex that the pills were Carisoprodol, which contains no controlled substances. Once he made this conclusion he conducted no further testing on these pills.

SA Allcox testified that the possibility of counterfeit pills does not render the visual identification method unsound or unreliable. SA Allcox explained that generally, he sees prescription tablets frequently and "test[s] them . . . on a daily basis in the crime laboratory." Further, SA Allcox indicated that he is aware of counterfeit pharmaceutical pills and stated that in his time with the SBI he has seen such pills. However, SA Allcox also explained that the "pharmaceutical · industry is very closely regulated" and genuine "pharmaceutical tablets are very uniform in size and appearance and color." On the other hand, SA Allcox recalled that his experience had shown counterfeit tablets to be "very mismatched [and] not uniform in appearance." Regarding the tablets examined in this case, SA Allcox said they appear to be authentic. Generally, as noted by the majority, defendant conceded the authenticity of "most of the seized items."

Before an expert's opinion is admissible at trial, the trial court must conclude the expert's "method of proof" is sufficiently reliable. *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004) (citing *State v. Goode*, 341 N.C. 513, 527-29, 461 S.E.2d 631, 639-40 (1995)). That determination is a "preliminary, foundational inquiry," *id.* at 460, 597 S.E.2d at 687, consistent with our trial courts' responsibility under the Rules of Evidence to decide "preliminary

questions concerning . . . the admissibility of expert testimony," *id.* at 458, 597 S.E.2d at 686 (citing N.C.G.S. § 8C-1, Rule 104(a) (2003)). In performing this task "trial courts are afforded wide latitude of discretion" that will be upset on appeal only if the trial court abuses its discretion. *Id.* (citations and internal quotation marks omitted).

In *State v. Goode* this Court recognized that to be admissible an expert's method of proof must be sufficiently reliable. 341 N.C. 513, 527-29, 461 S.E.2d 631, 639-40. A trial court may consider expert testimony related to reliability, take judicial notice of the method's reliability, or rely on some combination of the two to make its decision. *Id.* at 530, 461 S.E.2d at 641 (citations omitted). In *Goode* the trial court heard testimony from the State's proffered expert regarding the reliability of bloodstain pattern interpretation. *Id.* We determined that the expert's testimony was sufficient to satisfy our reliability standard. *Id.* Additionally, we noted that our appellate courts had previously "implicitly accepted bloodstain pattern interpretation as a scientific method of proof." 341 N.C. at 530-31, 461 S.E.2d at 641. Accordingly, we determined that the trial court properly admitted expert testimony interpreting bloodstain patterns from a crime scene. *Id.* at 524, 530-31, 461 S.E.2d at 637-38, 641-42.

Several years later, in *Howerton v. Arai Helmet, Ltd.*, we examined the reliability standard of *Goode* and compared it with the reliability standard under the federal evidentiary rules to determine whether the standards are the same. Ultimately, we concluded that our trial courts are not required to thoroughly scrutinize an expert's scientific method like the Supreme Court of the United States required of federal trial courts in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). *Howerton*, 358 N.C. at 455-69, 597 S.E.2d at 684-93. While *Daubert* required federal trial courts to determine, *inter alia*, whether an expert's method of proof is " 'scientifically valid,' " *id.* at 456, 597 S.E.2d at 685 (quoting *Daubert*, 509 U.S. at 592-93, 113 S. Ct. at 2796, 125 L. Ed. 2d at 482), the *Goode* standard requires our trial courts to inquire only into the "basic methodological adequacy" of an expert's method of proof, *id.* at 460, 597 S.E.2d at 687.

Perhaps most importantly, we emphasized that the *Goode* standard does not require an expert's method "to be proven conclusively reliable or indisputably valid." *Id.* We explained there is a "fundamental distinction between the admissibility" and the credibility of evidence. *Id.* (citing *Queen City Coach Co. v. Lee*, 218 N.C. 320, 323, 11 S.E.2d 341, 343 (1940)). We recognized that even after satisfying

our admissibility standard, there may be "lingering questions or controversy concerning the quality of the expert's conclusions," but added that those matters affect the testimony's weight and credibility, not its admissibility. 358 N.C. at 461, 597 S.E.2d at 688 (citations omitted). We reminded the bench and the bar that " '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " *Id.* (quoting *Daubert*, 509 U.S. at 596, 113 S. Ct. at 2798, 125 L. Ed. 2d at 484) (alteration in original).

The standard of reliability for admitting expert testimony in our trial courts was illustrated just last year in *Crocker v. Roethling*, 363 N.C. 140, 675 S.E.2d 625 (2009).[6] In that case the plaintiffs sought to demonstrate that the defendant medical doctor breached the applicable "same or similar community" standard of care when he failed to perform a Zavanelli maneuver during delivery of their daughter. 363 N.C. at 141, 675 S.E.2d at 627 (Hudson & Timmons-Goodson, JJ.). The trial court excluded testimony from the plaintiffs' expert, John P. Elliott, M.D., as it appeared that he was "insufficiently familiar" with the applicable standard of care, *id.* at 143, 675 S.E.2d at 628, and that he failed to demonstrate a reliable method by which he formed his opinion on the content of the applicable standard of care, 363 N.C. at 158, 675 S.E.2d at 637-38 (Newby, J., Parker, C.J. & Brady, J., dissenting).

This Court reversed the exclusion of that testimony even though "Dr. Elliott had never practiced in Goldsboro and admitted in his deposition that he had never even practiced in a community similar to Goldsboro." *Id.* at 160, 675 S.E.2d at 639. Further, Dr. Elliott testified at his deposition that he "had never performed the Zavanelli maneuver, nor had he ever observed it performed during his twenty-four years of practice in Phoenix." *Id.* at 150-51, 675 S.E.2d at 633 (Martin & Edmunds, JJ., concurring). In fact, he formed his opinion "in part on a worldwide study that found only about one hundred reported cases in which the Zavanelli maneuver was used between 1985, when the maneuver was first mentioned in medical literature, and 1997, four years before [plaintiffs' daughter's] birth." *Id.* at 162, 675 S.E.2d at 640 (Newby, J., dissenting).

---

6. There is no majority opinion in this case. Justice Hudson filed an opinion in which Justice Timmons-Goodson joined. Justice Martin filed an opinion in which Justice Edmunds joined. Together, these opinions constituted "a majority of the Court in favor of reversing and remanding." *Crocker*, 363 N.C. at 154 n.1, 675 S.E.2d at 635 n.1 (Newby, J., dissenting).

**STATE v. WARD**

[364 N.C. 133 (2010)]

In reversing the trial court's decision excluding the expert's opinion, the opinions composing the majority emphasized that the threshold reliability standard in this state is not exacting. Justice Hudson's opinion indicated that the threshold admissibility standard is met if the expert asserted familiarity with the applicable standard of care. *Id.* at 148, 675 S.E.2d at 631 (Hudson, J.). Justice Martin's opinion echoed that sentiment, stating that the foundational inquiry does not require conclusive reliability. *Id.* at 149, 675 S.E.2d at 632 (Martin, J., concurring). Justice Martin's opinion explained that "[e]vidence may be ' " 'shaky but admissible,' " ' and it is the role of the jury to make any final determination regarding the weight to be afforded to the evidence." *Id.* at 150, 675 S.E.2d at 632 (quoting *Howerton*, 358 N.C. at 460-61, 597 S.E.2d at 687-88).

Additionally, the Court made clear that there is no particular scientific method required to satisfy the reliability standard of *Goode*. Justice Hudson's opinion explained that "our statutes [and] case law . . . do [not] prescribe any particular method by which a medical doctor must become 'familiar' with a given community. Many methods are possible, and our jurisprudence indicates our desire to preserve flexibility in such proceedings." *Id.* at 147, 675 S.E.2d at 631 (Hudson, J.). The other two opinions agreed. *Id.* at 151, 675 S.E.2d at 633 (Martin, J., concurring); *id.* at 158, 675 S.E.2d at 637 (Newby, J., dissenting).

Finally, the opinions composing the majority reminded our trial courts that they should not exercise their discretion in a manner that excludes "shaky" expert testimony. Justice Hudson's opinion stated that this Court has "cautioned trial courts against 'asserting sweeping pre-trial "gatekeeping" authority . . . [which] may unnecessarily encroach upon the constitutionally-mandated function of the jury to decide issues of fact and to assess the weight of the evidence.' " *Id.* at 147-48, 675 S.E.2d at 631 (Hudson, J.) (citations omitted). Similarly, Justice Martin's opinion emphasized the distinction this Court drew in *Howerton* between the stringent federal standard and our flexible standard that preserves the constitutional role of the jury. *Id.* at 150, 675 S.E.2d at 632-33 (Martin, J., concurring).

*Crocker* demonstrates the reliability of SA Allcox's method in the case *sub judice*. In *Crocker* the expert's testimony was markedly less reliable than SA Allcox's testimony. The expert in *Crocker* had never performed or seen a Zavanelli maneuver during roughly twenty-five years of practice. This patent lack of experience notwithstanding, this Court concluded that the trial court committed reversible error

by excluding his testimony opining that such a maneuver was part of the standard of care for a medical doctor practicing in Goldsboro because, in part, a study found that roughly ten Zavanelli maneuvers were performed worldwide each year between 1985 and 1997. *See* 363 N.C. at 162, 675 S.E.2d at 640 (Newby, J., dissenting). If the trial court in *Crocker* committed reversible error by excluding the expert's testimony, then SA Allcox's method of proof—utilizing over thirty-four years of experience in performing an analysis relied upon by both law enforcement and medical professionals—is sufficiently reliable under the *Goode* standard. If visual identification is sufficiently reliable in potentially life-and-death scenarios, it is difficult to fathom how the majority concludes the method is legally inadequate.

Furthermore, our recent decision in *State v. Llamas-Hernandez*, reversing the decision of the Court of Appeals "[f]or the reasons stated in the dissenting opinion," 363 N.C. 8, 673 S.E.2d 658 (2009), demonstrates that the trial court here did not abuse its discretion. In *Llamas-Hernandez* the dissenting opinion determined that the trial court abused its discretion when it allowed a police detective to provide lay opinion testimony that non-descript white powder was cocaine. 189 N.C. App. 640, 651, 654, 659 S.E.2d 79, 86, 88 (Steelman, J., concurring in part and dissenting in part).

The dissenting judge in *Llamas-Hernandez* offered several reasons for his conclusion. First, his opinion explains that, because our General Statutes contain technical definitions of controlled substances and procedures for admitting and allowing access to laboratory reports, expert testimony (rather than lay testimony) is needed to prove the existence of a controlled substance. *Id.* at 652-53, 659 S.E.2d at 86-87 (citations omitted). Second, the dissenting judge opined that the white powder had no characteristics that could be distinguished by sight. The dissenting opinion explained that while crack cocaine "pills" may be susceptible to visual identification because of their "distinctive color, texture, and appearance," *id.* at 654, 659 S.E.2d at 87, powdered cocaine is "a non-descript white powder" not conducive to a visual identification, *id.* The dissenting opinion's reasoning was consistent with long-standing precedent regarding the visual identification of controlled substances. *See State v. Fletcher*, 92 N.C. App. 50, 56-58, 373 S.E.2d 681, 685-86 (1988) (upholding the trial court's admission of expert testimony based on a visual examination that a substance was marijuana while stating that evidence of a chemical analysis would be entitled to greater weight).

In the case *sub judice*, an expert visually identified controlled substances with distinguishing characteristics. It is already established that SA Allcox is a qualified expert. Furthermore, SA Allcox explained that the manner in which he performed his analysis was to first "make notes of its pharmaceutical markings, its appearance, its color, its size, and its shape." These are all distinctive characteristics. SA Allcox would then locate the matching tablet in the Micromedex publication, from which he learned the "contents, the manufacturer and the type of substances in the tablets." In other words, SA Allcox described to the trial court the manner in which he used his experience and credentials to not only ascertain the distinctive characteristics of the pills he was examining and then determine their composition from Micromedex, but also to ensure that the pills were not counterfeit. As such, the trial court soundly exercised its discretion.

The majority's decision to the contrary significantly alters the law of this state as it pertains to the admission of expert testimony. At the outset, the majority's holding is essentially contrary to a point on which this Court unanimously agreed in *Crocker*: that because the *Goode* standard can be satisfied in any number of ways, trial courts should not lightly dismiss a particular method. *Crocker*, 363 N.C. at 147, 675 S.E.2d at 631 (Hudson, J.); *id.* at 151, 675 S.E.2d at 633 (Martin, J., concurring); *id.* at 158, 675 S.E.2d at 637 (Newby, J., dissenting). However, today the majority determines that "[u]nless the State establishes . . . another method of identification is sufficient to establish the identity of the controlled substance beyond a reasonable doubt, some form of scientifically valid chemical analysis is required." This holding expressly limits the manner in which an expert may arrive at his or her opinion, in direct contradiction of this Court's statements in *Crocker*.

Further, the majority's decision appears to raise the threshold for the admission of expert testimony from the level established in *Crocker*. In *Crocker* we determined that the trial court erred by excluding expert testimony regarding the propriety of a rarely used procedure in a small community from an expert who utilized no relevant experience in his method of proof. Yet here the Court concludes that an expert's method of proof is unreliable despite his many years of experience performing the method and its use in the medical community. Such a conclusion most assuredly raises the admissibility standard from where it stood after *Crocker*.

Perhaps most significantly, the majority changes the foundational inquiry our trial judges must conduct prior to admitting an expert's

opinion. In *Howerton* we explained that the federal trial courts are required to thoroughly scrutinize and determine that an expert's method of proof is "scientifically valid" before admitting that opinion. 358 N.C. at 456, 597 S.E.2d at 685 (quoting *Daubert*, 509 U.S. at 592-93, 113 S. Ct. at 2796, 125 L. Ed. 2d at 482). We then distinguished our approach as "decidedly less mechanistic and rigorous than the exacting standards of reliability demanded by the federal approach." *Id.* at 464, 597 S.E.2d at 690 (citation and internal quotation marks omitted). Despite this illustration, the majority today emphasizes on several occasions that the trial court abused its discretion by admitting the expert's opinion in this case because the expert's method of proof is not "scientifically valid." Accordingly, it seems the majority's decision has altered the inquiry our trial courts must conduct.

The majority's attempt to use the present case's status as a criminal prosecution to justify its decision is unpersuasive. There is only one evidentiary standard for expert testimony. *See* N.C.G.S. § 8C-1, Rule 702 (2009). Further, we relied upon *Goode*, a criminal case, to provide our admissibility framework in *Howerton* and *Crocker*, both civil cases. The majority approves of such interchangeable use because its opinion relies upon *Goode*, *Howerton*, and *Crocker*. Nonetheless, the majority relies on Confrontation Clause cases to support its conclusion that SA Allcox's method of proof "is not sufficiently reliable *for criminal prosecutions*." (Emphasis added.) The majority advances as the purpose of the Confrontation Clause to " 'ensure reliability of evidence.' " (Quoting *Crawford v. Washington*, 541 U.S. 36, 61, 124 S. Ct. 1354, 1370, 158 L. Ed. 2d 177, 199 (2004).) The majority opinion correctly recites the Clause's purpose, but misses its focus. The Confrontation Clause is a "procedural . . . guarantee." *Crawford*, 541 U.S. at 61, 124 S. Ct. at 1370, 158 L. Ed. 2d at 199. Those accused of criminal offenses are entitled to cross-examine the witnesses against them. This is the same procedural protection we afford in regard to all expert witnesses. As we said in *Howerton*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 358 N.C. at 461, 597 S.E.2d at 688 (citations and internal quotation marks omitted) (alteration in original). Therefore, whether a case is criminal or civil in nature does not change the tenet that cross-examination is properly used to illustrate to the jury an opinion's shortcomings. However, the Confrontation Clause should not prevent the jury from considering the opinion altogether.

Moreover, the majority's attempt to justify its reasoning by noting the allegedly increasing incidents of counterfeit pharmaceutical drugs is similarly unavailing. Initially, there is some question regarding the propriety of reversing a discretionary decision of a trial court in reliance upon facts not presented to the trial court and that are not part of the record on appeal. In any event, the majority's creation of a prophylactic measure intended to prevent confusing a fake controlled substance with the genuine article is unwarranted. The General Assembly has provided a mechanism for a defendant to obtain evidence against him and have it tested. N.C.G.S. § 15A-903(a)(1) (2009). A defendant simply has to ask the trial court to order the State to produce the physical evidence, and the court must do so. *Id.* As the General Assembly has enacted this safeguard, the majority's attempt to use this case's classification as a criminal prosecution to justify its alteration of our evidence law is unfounded.

The majority concedes that the medical profession uses the Micromedex publication to identify medications when accurate identification could mean the difference between life and death. Yet the majority concludes that an expert opinion based on Micromedex is not sufficiently reliable to even be presented as *potentially* persuasive evidence to a criminal jury. Notwithstanding the majority's implications to the contrary, I believe that the medical profession's desire for appropriate diagnosis and treatment is as significant as that of our judicial system for accurate verdicts.

Whereas the majority concludes that the trial court's decision lacked a basis in reason, I believe the trial court exercised its discretion in a manner that comports with the law of this state regarding admission of expert testimony. Accordingly, I respectfully dissent.